UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**WILLIAM ELLIOTT ASHFORD**, *an individual*,

     Plaintiff,

vs.

Case No.  20-cv-
Hon.
Mag.

**UNIVERSITY OF MICHIGAN, UNIVERSITY OF MICHIGAN – DEARBORN, GARY GORSKI**, *an employee of the University of Michigan and the University of Michigan-Dearborn, sued in his personal and official capacity, jointly and severally,* and **JEFFREY EVANS**, *an employee of the University of Michigan and the University of Michigan-Dearborn, sued in his personal and official capacity, jointly and severally,*

     Defendants.

_____

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Alana A. Karbal (P82908)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
akarabal@deborahgordonlaw.com

_____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff William Elliott Ashford, by his attorneys Deborah Gordon Law, complains against Defendants Gary Gorski, Jeffrey Evans, the University of Michigan – Dearborn, and the University of Michigan as follows:

## Jurisdiction and Parties

1.      This is an action by Plaintiff William Elliott Ashford against Defendants Gary Gorski, Jeffrey Evans, the University of Michigan – Dearborn, and the University of Michigan for retaliating against Plaintiff for exercising his Constitutional right to free speech, and violations of Michigan's Whistleblower statute, and Michigan public policy.

2.      This Court has federal subject matter jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 USC § 1367.

3.      Plaintiff William Elliott Ashford ("Ashford") is a resident of Michigan and resides in the Eastern District of Michigan.

4.      Defendant Gary Gorski is an individual who at all pertinent times served as the Chief of Police for the University of Michigan – Dearborn, and upon information and belief, is a resident of Michigan and resides in the Eastern District of Michigan.

5.      Defendant Jeffrey Evans is an individual who at all pertinent times served as the Vice Chancellor for Business Affairs at for the University of

Michigan – Dearborn, and upon information and belief, is a resident of Michigan and resides in the Eastern District of Michigan.

6.     Defendant University of Michigan – Dearborn ("UM-Dearborn") is a public university with its campus located in Dearborn, Michigan.

7.     Defendant University of Michigan ("UM") is a public university, with its main campus located in Ann Arbor, Michigan.

8.     The events giving rise to this matter occurred in the Eastern District of Michigan, and as a result venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391.

## Background Facts

9.     Plaintiff is a dedicated public servant.

10.    Plaintiff served in the United States Marine Corps for 8 years, and was honorably discharged in June 2000.

11.    Plaintiff has been a police officer for 24 years.

12.    Plaintiff has, over the course of his extensive career in public safety, gained significant expertise in the investigation of sex crimes.

13.    Before joining the UM-Dearborn Police Department in 2017, Plaintiff spent 22 years as a police officer for the City of Detroit, where he worked as a Detective in the sex crimes unit for 2 years.

14. Plaintiff's performance while employed by Defendants has at all times been satisfactory or better. He is highly trained and experienced, and received commendations from his superiors.

**Incident Number 19-047 is Reported to the UM-Dearborn Police Department**

15. On March 1, 2019, a UM-Dearborn student presented to St. Joseph Mercy Hospital in Ypsilanti, Michigan, and stated that she had been sexually assaulted by her UM-Dearborn instructor, Professor Jay Paul Stasser.

16. The hospital immediately administered a sexual assault examination.

17. A University of Michigan – Ann Arbor Police Officer took the victim's initial report, which stated that Stasser forced the victim to perform oral sex on him in his office in the Science Faculty Building located on UM-Dearborn's campus.

18. After the assault, Stasser emailed the victim, stating, "[T]he next time you want to work on your grade, you know what we can do." He changed the victim's grade in his course from a "D" to a "B".

19. UM Division of Public Safety and Security had jurisdiction over the case because it occurred on University property.

20. Interim UM-Dearborn Police Chief Timothy Wiley coordinated the Department's investigation, and relayed the initial report to UM-Dearborn Police Captain James Knittel.

21.    After receiving the report on March 1, 2019, Interim Chief Wiley told Plaintiff that pursuant to the UM-Dearborn Police Department's practices, the victim's statement would not be taken because the statement "could come back to haunt us in court."

22.    Interim Chief Wiley also told Plaintiff that Captain Knittel had been dispatched to interview Stasser at his home.

23.    Plaintiff stated that Stasser should not be interviewed in his home, but should rather be interviewed in a controlled atmosphere where the exchange could be audio and video recorded.

24.    Interim Chief Wiley stated that the protocol the investigating officers used did not matter, because the Wayne County Prosecutor's Office already notified the department that they would not bring charges in the case.

25.    During the interview at his home, Stasser confessed that he engaged in sexual contact with the victim.

26.    Defendants' policies forbid faculty-student sexual relationships, even where consensual. Defendants' policies also forbid faculty to engage in quid pro quo sexual harassment, or in other words, exchange grades for sexual favors.

27.    It is undisputed that Stasser's actions constitute a per se violation of Defendants' policies.

28.     Days after the assault, Defendants permitted Stasser to resign his position with the University with a clean record. Upon information and belief, Stasser is employed at another university.

**Defendants Systematically Turned a Blind Eye to Faculty Sexual Misconduct**

29.     For several years, Defendants have been under intense media, public, and government scrutiny regarding their handling of incidents of criminal sexual conduct on campus, including sexual assault.

30.     Throughout 2014, 2015, and 2016 UM made multiple efforts to avoid sanctions from the federal government and to convince the public that it was working hard to protect women on campus. *See, e.g.*, Michigan Daily Editorial Board, *Sexual Misconduct Education is Key*, Michigan Daily (Sept. 16, 2016), https://www.michigandaily.com/section/editorials/daily-mandatory-reporting-sexual-misconduct-education-online-tool-faculty.

31.     Recently, Defendants have come under fire for their mishandling of sexual harassment and sexual assault by faculty members. Several victims of harassment and assault by faculty have alleged that Defendants downplay, and in some instances, ignore faculty sexual misconduct against students in order to protect the faculty.

32.     Notably, until late 2019, Defendants did not require that faculty take any training regarding the prevention of or appropriate responses to sexual harassment and assault.

33.     According to the Michigan Daily, an undergraduate student of the UM School of Music, Theatre, and Dance alleged that after she reported sexual assault and harassment by her graduate student instructor, that the OIE slow-walked the investigation and allowed the alleged assailant and UM officials to retaliate against her. *See* Nisa Khan and Mya Goldman, "*Broken Record: Student survivor navigates painful reporting process*," The Michigan Daily (October 23, 2018), https://www.michigandaily.com/section/community-affairs/broken-record-student-survivor-navigates-painful-reporting-process.

34.     In November 2018, the Michigan Daily reported allegations that UM tolerated well-known, widespread sexual misconduct by Professor David Daniels for years. The University awarded Daniels tenure mere months after brushing aside credible allegations that he solicited students for sex in exchange for money, and only began to take action against him after one of his prior victims went to the media with his allegations of sexual assault. Daniels' students alleged that UM protected Daniels for years because of his star-faculty status. *See* Elizabeth Lawrence and Julie Fanzeres, "*University neglects numerous sexual misconduct claims against famous voice professor,*" The Michigan Daily (November 1, 2018),

https://www.michigandaily.com/section/community-affairs/university-neglects-numerous-sexual-misconduct-claims-against-famous-voice.

35.   In December 2018 and February 2019, the Michigan Daily reported that a former student's complaint that a UM professor sexually assaulted her went unanswered for over a year. Multiple students alleged that UM tolerated the professor's well-known, widespread sexual misconduct towards students throughout his 40-year career. Much like in this case, the professor was allowed to retire in lieu of discipline. *See* Sammy Sussman, "*Sexual misconduct complaint about U professor goes unanswered for more than a year.*" The Michigan Daily (February 5, 2019), https://www.michigandaily.com/section/campus-life/sexual-misconduct-complaint-about-u-professor-goes-unanswered-over-year. *See also* Sammy Sussman, "*Former students bring 40 years of misconduct allegations by SMTD professor.*" The Michigan Daily (December 10, 2018), https://www.michigandaily.com/section/community-affairs/former-students-bring-40-years-misconduct-allegations-smtd-professor.

36.   Recently, as reported by the Detroit News, dozens of University students and faculty sent a letter to President Schlissel expressing that after interacting with the OIE regarding claims of faculty misconduct they "do not have faith in the University of Michigan's institutional processes for addressing sexual misconduct… Repeatedly, the institution has failed to protect its students, and

8

failed to meet its obligations under Title IX." The letter alleged that at least six women from four institutions, including UM, alleged sexual misconduct by the faculty member since 2016. *See* Kim Kozlowski, "*Students, faculty slam UM's handling of sex misconduct cases.*" The Detroit News (February 7, 2020), https://www.detroitnews.com/story/news/education/2020/02/07/students-faculty-slam-university-michigan-over-sex-misconduct-cases/4682792002/.

37.   It also recently came to light that at least three times, complaints of sexual misconduct and inappropriate behavior were lodged against Provost Martin Philbert. One involved a lawsuit UM settled containing allegations that Philbert and a subordinate researcher in his lab had a physical relationship; other complaints involved Philbert making "verbal overtures" to various individuals who worked for and with him. Philbert was finally placed on administrative leave in January 2019 after still more allegations of sexual misconduct. More than 20 women have now made sexual misconduct complaints against him, some of which stretch back more than a decade. *See* David Jesse, "*High-raking UM official has years of misconduct allegations—and school knew.*" The Detroit News (February 12, 2020), https://www.freep.com/story/news/education/2020/02/12/university-michigan-provost-martin-philbert-sexual-misconduct/4656749002/.

38.   By 2019, Defendants engaged in a pattern of behavior designed to protect their public image by shielding faculty from allegations of sexual assault.

9

39.     Notably, students at the UM-Dearborn campus were left particularly vulnerable to faculty sexual misconduct, because until October 2018, UM-Dearborn did not have an Office of Institutional Equity ("OIE"). The OIE is responsible for receiving and adjudicating internal complaints of harassment and discrimination, including those of sexual harassment and assault by faculty members.

40.     As of August 2019, UM-Dearborn still did not have a Title IX Coordinator.

41.     Nor did UM or UM-Dearborn track the number of complaints of sexual harassment and assault lodged against faculty members.

42.     In his position as Vice Chancellor of Business Affairs, Defendant Jeffrey Evans had oversight over the UM-Dearborn Division of Police and Public Safety, which includes the UM-Dearborn Police Department, during this time.

43.     Under Defendant Evans' influence and direction, the UM-Dearborn Police Department supported Defendants' efforts to turn a blind eye to faculty sexual misconduct by misreporting crime statistics related to sexual misconduct.

**Defendants Refuse to Take Action on Incident Number 19-047, and Attempt to Cover Up their Inaction**

44.     In/around May 2019, after Captain Knittel took over the investigation of Incident Number 19-047, Defendant Evans promoted Captain Knittel to the position of Deputy Chief.

10

45.     Also in May 2019, Deputy Chief Knittel and Interim Chief Wiley announced at a meeting Plaintiff attended that after composing a warrant package for Incident Number 19-047, they submitted it to the Wayne County Prosecutor's Office ("WCPO").

46.     In June 2019, Defendant Gary Gorski was appointed as the UM-Dearborn Police Chief.

47.     Later in July 2019, Plaintiff developed serious concerns about the warrant package Knittel claimed to have submitted for Incident Number 19-047, and whether it had actually been submitted to the WCPO.

48.     In August 2019, Plaintiff contacted a Wayne County Assistant Prosecuting Attorney and inquired whether the WCPO received a warrant package regarding Incident Number 19-047. WCPO had not received any warrant package associated with the case.

49.     Plaintiff also checked the UM-Dearborn Police Department's public record log book (which records all campus crime statistics), which stated that the UM-Dearborn Police Department handled Incident Number 19-047, and had closed the case after referring it to the WCPO.

50.     Defendants reported false information about Incident Number 19-047 in the public record log book.

51.     Plaintiff began to doubt whether Defendants would take any further action on Incident Number 19-047 to report it to WCPO.

52.     On September 4, 2019, Plaintiff again asked the WCPO to check whether a warrant package had been submitted for Incident Number 19-047. No warrant package had been submitted.

53.     Also on September 4, 2019, Plaintiff met with Defendant Gorski, and informed him that although the Department's records reflected that the UM-Dearborn PD had closed Incident Number 19-047 upon referral to the WCPO, the WCPO had not received any such warrant package.

54.     Defendant Gorski stated that upon assuming his position as Chief, Deputy Chief Knittel told him that the UM-Dearborn Police Department investigated Incident Number 19-047, and had closed the case after sending a warrant package to the WCPO.

55.     Plaintiff explained to Defendant Gorski that he believed Defendants were altering their criminal sexual conduct statistics under pressure from Defendant Evans.

56.     Defendant Gorski said he would look into the matter and get back to Plaintiff with his findings.

57.   In September 2019, Plaintiff also met with UM-Dearborn Human Resources and reported the improprieties he observed with the Department's handling and reporting of Incident Number 19-047.

58.   Defendants' Human Resources took no action on Plaintiff's report.

59.   On or around September 11, 2019, Defendant Gorski told Plaintiff that Deputy Chief Knittel admitted that Incident Number 19-047 **had not** been submitted to the WCPO, allegedly because the UM-Dearborn Police Department was waiting for the City of Dearborn Police Department to collect DNA from the victim and Stasser.

60.   Plaintiff also explained to Defendant Gorski that according to best practices for the investigation of sex crimes, it was unnecessary to delay submission of the warrant package due to outstanding DNA analysis because Stasser had already confessed to engaging in sexual contact with the victim.

61.   Plaintiff further explained that given the serious nature of the case and the 6 month-long delay, the warrant package should have been submitted immediately.

62.   Defendant Gorski could not explain why the case status was intentionally falsely reported. Nor did he have any plausible rationale for why a warrant package had not yet been submitted to the WCPO.

63.    Even well after the DNA analysis was returned on September 12, 2019, Defendants took no action to move forward on Incident Number 19-047.

64.    Defendants actively sought to conceal the intentional dereliction of their responsibilities with regard to the case.

### Plaintiff Alerts the UM-Dearborn Board of Regents of Defendants' Wrongdoing

65.    On September 16, 2019, Plaintiff sent an anonymous email to the UM-Dearborn Board of Regents reporting Defendants' wrongdoing with regard to Number 19-047, including Defendants' efforts to conceal their wrongdoing.

66.    Defendants took no action on Plaintiff's report.

### Plaintiff Notifies the WCPO and Public of Defendants' Wrongdoing

67.    By October 2019, Plaintiff had alerted his chain of command, Defendants' Human Resources Department, and the UM-Dearborn Board of Regents of the Department's wrongdoing, to no avail.

68.    Plaintiff was disturbed that the Department was turning a blind eye to Incident Number 19-047. He feared the effect this would have on the victim, other victims of sex crimes at UM-Dearborn, the University's public image, and the public safety in general.

69.    On October 11, 2019, a newspaper submitted a FOIA request to the UM-Dearborn Police Department, the Dearborn Police Department, and the WCPO for documents regarding the status of Incident Number 19-047.

70.     After receiving the October 11, 2019 FOIA request, Defendants altered their records of Incident Number 19-047 to reflect that the case was open, and being handled jointly by the UM-Dearborn Police Department and the City of Dearborn Police.

71.     Shortly after the FOIA request came in, Deputy Chief Knittel met with a Dearborn Police Detective regarding Incident Number 19-047, after which a warrant package regarding Incident Number 19-047 was submitted to the WCPO.

72.     Plaintiff spoke with the news reporter about the matter anonymously, in an attempt to reveal the truth about the mishandling of the case.

73.     On October 24, 2019, the WCPO contacted Plaintiff regarding Incident Number 19-047.

74.     On November 3, 2019, after the case was closed, The Detroit News ran a story entitled, "Staffer accused UM-Dearborn of trying to cover up student's sex allegation against lecturer[1]."

75.     Defendants were unhappy about the public coverage of the case.

76.     On November 4, 2019, Defendant Gorski told Plaintiff, "We have to have each other's back," and that the article could have "significant negative implications for the University."

---

[1] George Hunter, "*Staffer accused UM-Dearborn of trying to cover up student's sex allegation against lecturer*," The Detroit News (Nov. 3, 2019), https://www.detroitnews.com/story/news/local/wayne-county/2019/11/04/staffer-says-um-dearborn-tried-cover-up-sex-claim-lecturer/2456412001/

**Defendants Retaliate Against Plaintiff for Exposing their Wrongdoing**

77.    On November 25, 2019, Defendant Gorski notified Plaintiff that he was the subject of an internal investigation.

78.    Defendants alleged that Plaintiff violated UM-Dearborn Division of Police and Public Safety policy by: making "statements that reasonably can be interpreted as intending to have an adverse effect upon department morale, discipline, operation of the Department, or perception of the public," and by "divulging or willfully permitting to have divulged any information gained by reason of their position for anything other than its official authorized purpose."

79.    On January 29, 2020, Defendants suspended Plaintiff for 10 days without pay for violating the above Department policies, and for refusing to provide the name of the individual who initially introduced Plaintiff to the news reporter.

80.    Plaintiff did not violate the policies at issue.

81.    Gorski later admitted to Plaintiff that his refusal to provide the name was "irrelevant."

82.    The Department's administration, including Defendant Evans, strongly recommended that Plaintiff's employment should be terminated.

83.    Defendants instructed Plaintiff that "further behaviors of this nature" would result in escalating discipline, including the termination of his employment.

**COUNT I**
*42 USC § 1983 – First Amendment Retaliation*

84.     Plaintiff repeats and realleges all paragraphs as if fully set forth herein.

85.     The First Amendment to the United States Constitution provides that, "Congress shall make no law abridging the freedom of speech."

86.     Plaintiff engaged in Constitutionally protected speech when he told the WCPO and The Detroit News that Defendants mishandled and misreported the investigation of Incident Number 19-047.

87.     This speech was on a matter of public concern, as its content included such topics as police corruption, the abuse of public office, matters of public safety, and whether Defendants intentionally mishandled and misreported a criminal sexual assault investigation.

88.     Plaintiff's speech was not pursuant to his official duties.

89.     Plaintiff's interest as a citizen in speaking on these matters and bringing Defendants' wrongdoing to light outweighed Defendants' interest as an employer in promoting the efficiency of the public services they performed through their employees.

90.     Plaintiff's interest as a citizen in speaking on these matters was significant, as they concerned substantial matters of law, ethics, and public safety that he was well informed of and entitled to make.

91.     Plaintiff's speech had no impact on the efficiency of the UM-Dearborn or Dearborn Police Departments or the WCPO in pursuing Incident 19-047, and therefore Defendants had no interest in curtailing this speech to promote the efficiency of the public services they performed through their employees.

92.     Defendants suspended Plaintiff and threatened his continued employment because he exposed the fact that they intentionally refused to act on Incident Number 19-047, and attempted to cover up this wrongdoing.

93.     The suspension and threat to Plaintiff's continued employment resulted in the loss of earnings and other employment benefits, as well as reputation, honor, and good standing in the community. These actions are sufficiently adverse so as to deter a person of reasonable firmness from exercising their right to free speech.

94.     Defendants' decision to suspend Plaintiff and threaten his continued employment was motivated, at least in part, by Plaintiff's exercise of his First Amendment right to free speech.

95.     Defendants retaliated against Plaintiff for exercising his First Amendment right to free speech.

96.     Defendants acted with deliberate indifference to Plaintiff's presumed and actual innocence.

97.    Defendants agreed to, approved, and ratified this unconstitutional conduct.

98.    It would have been plainly obvious to a reasonable official that such actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

99.    Defendants' actions and inaction, as set forth above, were fundamentally unfair to Plaintiff.

100.    There exists no rational relationship between Plaintiff's actual conduct and the discipline imposed against him by Defendants.

101.    Defendants, by their agents, representatives, and employees acting under color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

102.    The acts of Defendants and their agents, representatives, and employees represent official policy of the University of Michigan and University of Michigan – Dearborn and are attributable to those entities.

103.    At all times material hereto, Plaintiff had a clearly established right to free speech which a reasonable public official would have known.

104.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered irreparable harm, injury, and damages, including but not limited to loss of earnings and employment benefits; loss of reputation restricting, if not

destroying, future employment opportunities; damage to Plaintiff's standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT II**
***Title IX – Retaliation***
***(As Against Defendants UM-Dearborn and UM)***

105.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

106.   Title IX prohibits retaliation against those who oppose discrimination on the basis of sex in educational institutions, including the University of Michigan.

107.   Title IX applies to an entire school or institution if any part of that school receives federal funds.

108.   Defendants receive federal funding.

109.   Plaintiff engaged in protected activity under Title IX by complaining about and opposing Title IX violations against the victim of Incident Number 19-047. Namely, he reported through his chain of command, to Defendants' Human Resources, and to the UM-Dearborn Board of Regents that Defendants refused to

take appropriate action on the sexual assault at issue in Incident Number 19-047, and that they sought to cover up this wrongdoing.

110. Plaintiff's protected activity was known to Defendants on or before November 4, 2019.

111. Thereafter, Defendant took adverse action against him by suspending him and threatening his continued employment.

112. This adverse action against Plaintiff was calculated to and did cause irreparable harm, injury, and damages, including but not limited to his earnings, benefits, career opportunities and earning capacity, as well as causing mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation.

113. As set forth above, there is a direct causal connection between Plaintiff's protected activity and Defendants' adverse action against him.

114. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered irreparable harm, injury, and damages, including but not limited to, loss of earnings and benefits, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation.

**COUNT III**
*Michigan Whistleblower Protection Act*

115.   Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

116.   Plaintiff was an employee and Defendants UM-Dearborn and UM were his employers covered by and within the meaning of the Whistleblowers' Protection Act, MCL 15.361 *et seq.* (WBPA).

117.   Defendants suspended Plaintiff and threatened his continued employment because he exposed the fact that they intentionally refused to act on Incident Number 19-047, and attempted to cover up this wrongdoing.

118.   Under Michigan law, misconduct in office by a law enforcement officer is an indictable offense, defined as "corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office, and is sustainable for misconduct including malfeasance (committing a wrongful act), misfeasance (performing a lawful act in a wrongful manner), and nonfeasance (failing to do an act required by the duties of the office). *See* MCL 750.505, *People v. Coutu*, 459 Mich. 348, 353 (1999); *People v. Coutu (On Remand)*, 235 Mich. App. 695, 705-706 (1999) (internal citations omitted).

119.   Defendants and/or their employees violated the above laws and/or Plaintiff reasonably believed they had violated them. He reported these violations

to his superior officer within his Department, the University's Board of Regents, the WCPO, and the public.

120.   Defendants knew not only that Plaintiff made internal reports of their wrongdoing up the chain of command through the UM-Dearborn Board of Regents, but also that he reported their wrongdoing to the WCPO and the public. They took disciplinary action against Plaintiff and threatened his future employment because of these reports.

121.   The retaliatory conduct of Defendants, their agents, representatives, and employees, including in committing, directing and/or condoning Plaintiff's suspension and the threat against his continued employment violated the Whistleblower's Protection Act.

122.   Defendants' actions, and those of their agents, representatives, and employees, were intentional, wanton, willful, malicious and taken in bad faith, in deliberate disregard of and with reckless indifference to the rights and sensibilities of the Plaintiff.

123.   As a further direct and proximate result of Defendants' wrongful acts, Plaintiff sustained injuries and damages including but not limited to loss of earnings and benefits, mental anguish, anxiety about his future, physical and emotional distress, humiliation and embarrassment, loss of personal and

professional reputation, damage to his good name and reputation, and loss of the ordinary pleasures of everyday life.

## COUNT IV
### *Retaliation in Violation of Public Policy of the State of Michigan*

124.   Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

125.   As described above, Plaintiff exercised his legal rights and otherwise engaged in protected activity by exercising his responsibility to raise his concerns, both verbally and in writing, and by refusing to acquiesce in of violations, or suspected violations, of the law, as set forth above.

126.   Under Michigan law, misconduct in office by a law enforcement officer is an indictable offense, defined as "corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office, and is sustainable for misconduct including malfeasance (committing a wrongful act), misfeasance (performing a lawful act in a wrongful manner), and nonfeasance (failing to do an act required by the duties of the office). MCL 750.505, *People v. Coutu*, 459 Mich. 348, 353 (1999); *People v. Coutu (On Remand)*, 235 Mich. App. 695, 705-706 (1999) (internal citations omitted).

127.   Plaintiff reasonably believed that Defendants were in violation of the above Michigan law with regard to their inaction on Incident Number 19-047 and attempts to cover up this inaction; he refused to acquiesce in these violations and

reported them to his superior officer within his Department, the University's Board of Regents, the WCPO, and the public.

128.   Defendants were aware of his refusal to acquiesce and his reports.

129.   Defendants, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Plaintiff by suspending him and threatening his continued employment for engaging in the above referenced protected activity.

130.   Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities. The temporal proximity between Plaintiff's protected activity and Defendants' materially adverse employment action is also a clear indicator of retaliatory conduct.

131.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered irreparable harm, injury, and damages, including but not limited to loss of earnings and employment benefits; loss of reputation restricting, if not destroying, future employment opportunities; damage to Plaintiff's standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

### A. LEGAL RELIEF

1.  Compensatory, economic, and noneconomic damages in whatever amount Plaintiff is found to be entitled;

2.  A judgment for lost wages and benefits, past and future, in whatever amount Plaintiff is found to be entitled;

3.  Exemplary damages in whatever amount Plaintiff is found to be entitled;

4.  Punitive damages in whatever amount Plaintiff is found to be entitled; and

5.  An award of interest, costs and reasonable attorney fees.

### B. DECLARATORY & EQUITABLE RELIEF

1.  An order from this Court requiring Defendants to remove all discipline related to the claims in this case from Plaintiff's record;

2.  An injunction from this Court prohibiting any further acts of discrimination, intimidation, or retaliation;

3.  An award of interest, costs, and reasonable attorney fees; and

4.  Whatever other declaratory and/or equitable relief appears appropriate at the time of final judgment.

Dated:  March 3, 2020                    **DEBORAH GORDON LAW**
                                         /s/Deborah L. Gordon (P27058)
                                         Elizabeth Marzotto Taylor (P82061)
                                         Alana A. Karbal (P82908)

26

Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
akarabal@deborahgordonlaw.com

## **JURY DEMAND**

Plaintiff William Elliott Ashford, by his attorneys **Deborah Gordon Law**, demands a trial by jury of all the issues in this cause.

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Alana A. Karbal (P82908)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
akarabal@deborahgordonlaw.com