UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| **WILLIAM ELLIOTT ASHFORD,** | **2:20-CV-10561-TGB-EAS** |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **UNIVERSITY OF MICHIGAN, et al.,** | |
| Defendants. | |

William Ashford has served as a security officer at the University of Michigan-Dearborn ("UM-Dearborn") Department of Public Safety and Security ("DPSS") since 2017. In 2019, a student at UM-Dearborn reported being sexually assaulted by one of her professors. Ashford observed what he considered a lack of progress on the investigation and began to fear a cover-up. After failed attempts to raise the matter internally, Ashford anonymously contacted a reporter, who eventually published a story. DPSS later disciplined Ashford for alleged violations of policy related to these events. As Plaintiff, Ashford brings this lawsuit challenging the discipline as retaliatory. Defendants have moved for

summary judgment. For reasons below, Defendants' Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

On March 1, 2019, a UM-Dearborn student reported that she had been sexually assaulted by a professor. ECF No. 27, PageID.1676. Ashford learned about the complaint when his supervisor (Interim UDPSS Chief Timothy Wiley) mentioned it to him that day. *Id.* at PageID.1680.

The day after the student made her report, officers from across the greater University of Michigan DPSS (including a Special Victims officer from Ann Arbor and Officer James Knittel from Dearborn) interviewed the professor at his home and took clothing samples from him. The professor resigned shortly thereafter. *Id.* at PageID.1680-82.

At a cross-campus DPSS meeting in May 2019, which included staff from the Ann Arbor, Flint, and Dearborn campuses, the case was reported as "closed." Both Wiley and Knittel announced at the meeting that a warrant package had been submitted to the Wayne County Prosecutor's Office ("WCPO") for the county prosecutor to decide whether to take the case forward. *Id.* at PageID.1682. Ashford was present at this meeting. Ashford Dep. 139:4-141:3, ECF No. 23-2, PageID.319-21. It would later become evident that the announcement was untrue; a warrant package was not submitted to WCPO until October 2019.

Sometime after the meeting, Ashford developed concerns that insufficient action was being taken on the case. Under the impression that WCPO was now handling the investigation, he called a contact at WCPO to ask about its status. He was informed that no warrant package had ever been submitted. Ashford Dep. 141:13-25, ECF No. 23-2, PageID.321. At this time, he also saw that the UM-Dearborn "Clery" Log—a document reflecting campus crime data that universities must keep updated and accessible to the public under the federal Clery Act— recorded that the case as "closed." He testified that seeing this gave him "great concern." *Id.* at 145:6, PageID.325.

On September 4, 2019, Ashford asked for a meeting with UM-Dearborn DPSS Chief Gary Gorski. At the meeting, Ashford shared his concerns about the case and raised the issue of whether there might be a "cover-up" of some sort going on. Gorski said he would look into it. Gorski later testified that he asked Knittel for the case file the next day, September 5, and reviewed it. Gorski Dep. 55:19-21, 56:18-20, ECF No. 23-4, PageID.604-05.

With no word from Chief Gorski, Ashford sent an email to UM-Dearborn Human Resources and met with a Human Resources employee on September 10 to outline his concerns about the investigation. This employee responded by sending several follow up emails to Ashford but does not appear to have taken any other actions. Ashford Dep. 156:20-13, ECF No. 23-2, PageID.336. Meanwhile, on September 11, Gorski told

3

Ashford that the case was "on hold" pending DNA analysis; Ashford found this perplexing because he was under the impression that no DNA analysis was needed because the professor had admitted to the sexual contact. *Id.* at 152:17-24, PageID.332. On September 16, he sent an anonymous letter to the UM-Dearborn Board of Regents with the same information. *Id.* at 165:14-166:2, PageID.346-47.

Ashford was not the only individual in the department concerned about the conduct of the investigation. In late September of 2019, another officer reached out to *Detroit News* reporter George Hunter about the case. Hunter submitted a FOIA request to the university for documents related to the case on October 11. This officer provided Hunter with Ashford's contact information; Ashford agreed to speak with the reporter in late October on condition of anonymity. ECF No. 27, PageID.1689.

Meanwhile, on or about October 16, Gorski instructed Knittel (now his Deputy Chief) to change the status of the case on the UMD Clery Log to "open." ECF No. 27-26. Sometime after that, documents pertinent to the FOIA request—including the now-modified Clery Log—were released to Hunter. A warrant request was submitted to WCPO on October 25, 2019. Gorski Dep. 215:22-216:2, ECF No. 23-4, PageID.764-65.

Hunter's article, which included information about the incident and allegations of a "cover-up" made by two anonymous informants (as we now know, Plaintiff and the other officer), was published on November 3, 2019.  ECF No. 27-23. Gorski immediately suspected Ashford of speaking

to the reporter and had a meeting with him on November 4, where Ashford confirmed he had spoken with Hunter. ECF No. 27, PageID.1690. At that meeting, Gorski told Ashford that they needed to "circle our wagons" around the university but that his "job [was not] in jeopardy." Ashford Dep. 197:10-200:20, PageID.377-80. However, Gorski went on to file an internal complaint against Ashford, which triggered a formal disciplinary inquiry called a Professional Standards Investigation ("PSI"). The PSI charged Ashford with violating two internal policies: (1) making "statements that reasonably can be interpreted as intending to have an adverse effect upon department morale, discipline, operation of the Department, or perception of the public," and (2) "[d]ivulg[ing] or willfully permit[ting] to have divulged any information gained by reason of their position for anything other than its official authorized purpose." ECF No. 23-7.

The investigation was conducted by Chief Robert D. Neumann from Ann Arbor DPSS, who submitted a final report to Chief Gorski. As a result of this investigation, Gorski ordered Ashford suspended for 10 days in January 2020. The report found Ashford to have violated department policies because he disclosed information to the media and refused to give up the name of the other officer who spoke with the *Detroit News*. ECF No. 23-7, PageID.1034-35. Ashford served his suspension and continues to work for the department.

Ashford now asserts that this discipline was retaliatory and in violation of the First Amendment and Title IX. He also brings claims under the Michigan Whistleblower Protection Act, MCL 15.361, and the public policy of the State of Michigan. He seeks removal of the disciplinary citation from his record, as well as damages from individual Defendants Gorski and Jeffrey Evans, who at the time of these events was Vice Chancellor with authority over UMD DPSS. The Court heard oral argument on this motion on January 19, 2022.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

6

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. According to qualified immunity doctrine, the non-moving party also has the burden of proving that the right allegedly violated was clearly established at the time of the incident in question. *See Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III.   ANALYSIS

### A. Count I: First Amendment retaliation

Ashford's first claim is that the discipline he received from his department was in retaliation for his communication with the *Detroit News* reporter, and therefore in violation of his rights under the First

Amendment. ECF No. 27, PageID.1699-1705. Defendants say that summary judgment should be granted in their favor on this claim because Ashford's speech was not constitutionally protected and because they are shielded by absolute or qualified immunity. ECF No. 22, PageID.155-163.

### i. Immunity

Before any consideration of the merits of this claim under § 1983, the Court must resolve the question of whether any of the Defendants are entitled to absolute immunity.

Sovereign or absolute immunity under the Eleventh Amendment bars suits against the state, or any state employees acting in their official capacity, for money damages. *Boler v. Earley*, 865 F.3d 391, 409 (6th Cir. 2017). Therefore, none of the four Defendants can be sued in an official capacity for money damages. Ashford concedes as much by not addressing this argument in his Response. However, Ashford is also asking for injunctive relief and a removal of the disciplinary notation from his record. As long as injunctive relief is prospective in nature, it is not barred by the Eleventh Amendment. *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (collecting cases holding that removal of disciplinary notations or corrections to records due to constitutional violations are prospective injunctive relief).

Ashford can sue the Defendants in their individual capacities for money damages under § 1983. Such claims will be subject to a qualified immunity analysis for any identified constitutional violation.

### ii.   Merits

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

For a public employee to show that their speech was protected, the employee must show: (1) that he spoke on "matters of public concern;" (2) that he spoke as a private citizen and not as an employee pursuant to his official duties; and (3) that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (internal citations omitted).

Defendants contend that the speech at issue here was not protected because Ashford cannot meet prongs (2) and (3) of the "public employee" analysis. ECF No. 22, PageID.159-63. They say that Ashford cannot show his speech was that of a private citizen, and that even if he satisfied this prong, the balancing of interests does not weigh in his favor.

### a. Was Ashford speaking as a private citizen?

The Sixth Circuit has indicated that, to determine whether a public employee's speech is protected (a question of law), courts should consider

"the speech's impetus; its setting; its audience; and its general subject matter. . . . 'who, where, what, when, why, and how' considerations . . . which inform . . . 'whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Mayhew*, 856 F.3d at 464 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)).

Courts have found that an individual has spoken as a private citizen when making statements in relation to union activities (*Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (concluding that union membership is not an "ordinary responsibility" of employment even if it arises as a result of employment)); when appearing "off duty, out of uniform, and at a public meeting to address the Mayor and City Council during the public comment period" regarding budget cuts (*Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011)); and when (as a firefighter) contacting multiple members of city council to express his concerns about budget cuts (*Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 528 (6th Cir. 2015)).

By contrast, courts have concluded that employees were not acting as private citizens under the following circumstances: a lab supervisor at a city's wastewater treatment plant reporting the misconduct of another employee to the plant manager and then to City Hall (*Mayhew*, 856 F.3d at 465 (concluding that such reporting was part of plaintiff's job duties)); a fire chief sending an email to employees about a potential threat to their continued employment (*Holbrook v. Dumas*, 658 F. App'x 280, 288

(6th Cir. 2016) (concluding that he was acting as a supervisor, not as a private citizen who learned the information); a school employee speaking out about what she perceived to be mismanagement of Title I funds through an anonymous letter to the *Detroit Free Press* (*Omokehinde v. Detroit Bd. of Educ.*, 563 F. Supp. 2d 717, 728 (E.D. Mich. 2008) ("Plaintiff's complaints to her supervisor . . . flowed directly from her duties and responsibilities as an employee . . . she repeated precisely the same complaints to an outside audience.)); and a jail administrator speaking out at a county Board of Commissioners meeting about air quality problems within the jail facility (*Meggison v. Charlevoix Cty.*, No. 1:07-CV-577, 2008 WL 5411896, at *5 (W.D. Mich. Dec. 23, 2008) (concluding that it was part of plaintiff's job to work with contractors and outside entities to remedy the issue)).

Here, the "speech" in question is Ashford's comments to the *Detroit News* reporter. Given the record, the Court does not find that these comments were a part of his job duties: Ashford has no role as a public relations officer, and as an officer he was never formally assigned to work on this case. While he was "inside" the police department, sufficient evidence indicates that he was acting as a concerned member of the general public rather than a police officer facing obstacles in his own work. That he acquired information about the investigation simply because he was an officer in the department does not automatically make his speech "employee" speech. *Lane*, 573 U.S. at 240 (holding that "the

mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee— rather than citizen—speech."). He also testified to the fact that he spoke to the *Detroit News* as a civilian private citizen because he felt he had no other available options. Ashford Dep. 176:15-18, ECF No. 23-2, PageID.356. The Court finds that his speech was that of a private citizen such that it could be protected under the First Amendment.

### b. Does the state interest outweigh the right to speak?

Defendants do not seem to dispute that the university's handling of student sexual assault complaints is a matter of public concern. They instead argue that their interest in "promoting the efficiency of the public services it performs" outweighs Ashford's right to speak on it.

But Defendants have not put any information on the record that Ashford's speech harmed their ability to efficiently carry out their duties. Several Defendants testified that there was no discernible backlash within the department or other disruption because of the *Detroit News* article. Evans Dep. 104:1-4, ECF No. 27-5, PageID.1813; Gorski Dep. 201:11-23, ECF No. 23-4, PageID.752.  Ashford's conduct is also not as severe as that in the case on which Defendants rely, where police officers engaged in a protracted, coordinated campaign of speaking to the media about alleged wrongdoing by their chief that was "clearly intended to create division among the officers." *See Graham v. City of Mentor*, 118 F. App'x 27, 30 (6th Cir. 2004). Here, Ashford spoke to one media outlet, one

12

time, and there is no indication that he was trying to get other police officers to rise up against leadership or otherwise "create division" within the ranks or disrupt department activity.

The Court must consider the possibility of disruption even in the absence of any evidence provided by the employer. *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017). But the Court finds that there is no reasonable basis to predict that Ashford's speech would cause such a disruption to the department that it would not be able to adequately perform its services. News stories about law enforcement operations are not uncommon, including stories where there is some anonymous or "inside" source quoted. It cannot be that any leak to news media, no matter how small, will automatically cause the balancing of interests to tip in favor of the state. If this were the case, state employees would have no protection for engaging in whistleblowing activity meant in good faith to *serve* the public interest. The state interest does not outweigh Ashford's right to speak on this matter, and therefore his speech was protected under the First Amendment.

### c. Can Plaintiff make out his retaliation claim?

Returning to the merits of Ashford's First Amendment claim, as stated, he must show three elements: (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in such conduct; and (3) a causal connection exists between elements one and two—that is, the

13

protected conduct was at least in part the cause of the adverse action. Defendants do not challenge prongs (2) and (3) of the prima facie case— *i.e.*, that adverse action was taken against Ashford, and that there is evidence of a causal relationship between the protected speech and the adverse action. Having found that Ashford's conduct was protected, the Court finds that he has established a prima facie case of retaliation.

If Ashford meets his burden of establishing a prima facie case of protected speech activity and retaliation in relation to it, the burden shifts to the Defendants to show, by a preponderance of the evidence, that there were other reasons for the adverse action and that the same result would have occurred even if the plaintiff had not engaged in the protected activity. *Maygar v. Clio Area Sch. Dist.*, No. 264931, 2006 WL 1115596, at *3 (Mich. Ct. App. Apr. 27, 2006). Defendants make no argument on this point, presumably because they do not dispute that his speech to the *Detroit News* is the reason he was disciplined.

Defendants' last line of defense regarding Ashford's First Amendment claim is that they are entitled qualified immunity. The qualified immunity analysis has two prongs. Courts must determine whether (1) the plaintiff can establish the violation of a constitutional right and (2) that right was clearly established at the time of the incident. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002).

Defendants do not dispute that Ashford had a clearly established right to exercise his free speech rights without retaliation. *See Zilich v.*

14

*Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional."). Rather, they argue that Ashford has no evidence of specific individual activity on the part of Evans and Gorski suggesting that they violated his rights, so he cannot meet prong (1) of the analysis. But both Gorski and Evans testified about to involvement with or knowledge of Ashford's PSI process and resulting disciplinary action, so there is a factual question about whether their direct actions were sufficiently connected to his discipline. *See* Evans Dep. 20:13-14, 90:15, 93:22-24; ECF No. 27-5, PageID.1792, 1810 ("I supported Chief Gorski's decision for the discipline;" "I was in the loop;" "I thought . . . that the discipline that he was issued was and is appropriate."); Gorski Dep. 19:24-21:4; ECF No. 23-4, PageID.568-70 (noting that he decides whether to sustain the findings of the PSI and he is part of the decision process regarding discipline). Therefore, the Court cannot find that they are entitled to qualified immunity.

For all of these reasons, Defendants' motion as to Count I is denied.

## B. Count II: Title IX

To make out a retaliation claim, "a Title IX plaintiff must show 'that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action.'" *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020). The

*McDonnell-Douglas* burden-shifting framework applies if the plaintiff relies on indirect evidence to demonstrate the retaliation. *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 319-20 (6th Cir. 2017). Under this framework, it is the plaintiff's burden to show the preceding elements are met. If he does so, the burden shifts to Defendants to offer legitimate reasons for the adverse action. If they do, the burden shifts back to the plaintiff to show that the reasons offered are pretextual. Pretext can be shown by putting forward evidence that the proffered reasons "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* at 322 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

Title IX claims can only be brought against federal funding recipients. The only such entities here are the institutional Defendants, the University of Michigan and the University of Michigan-Dearborn. Under Title IX, Ashford argues that his protected activity is "complaining about and opposing Title IX violations," specifically through his reports about what he perceived to be a mishandling of the investigation to his chain of command, Defendants' HR, and the UM-Dearborn Board of Regents. ¶ 109, ECF No. 1. For this claim, the alleged protected activity is thus not the speech to the *Detroit News* reporter, but his other communications, all of which occurred in September 2019.

16

### i. Causation

Defendants argue that Ashford cannot show a causal connection between his suspension and his reporting activities. Ashford responds that the temporal proximity of the activities and the punitive nature of the actions is sufficient evidence of causation to establish a prima facie case. ECF No. 27, PageID.1705.

Ashford has provided some evidence to show causation. The PSI was launched immediately after Defendants learned about the activities related to this claim, because they learned that he was the author of the emails to HR and to the Board of Regents at the same time they learned he was the leak to the *Detroit News*. Defendants rightly note that this kind of temporal proximity cannot show causation on its own. *Dibbern v. Univ. of Mich.*, No. 12-15632, 2013 WL 6068808, at *10 (E.D. Mich. Nov. 18, 2013). But there is other evidence of causation in the record: Gorski testified that the reason for initiating the PSI was Ashford's "statements" that "the Department engaged in a coverup of a crime." Gorski Dep. 180:12-19, 199:5-200:6, ECF No. 23-4, PageID.729. The email to the Board of Regents uses the phrase "cover up a mistake" in describing the department's potential motivations for its actions. ECF No. 27-24.

The text of the PSI report references only the leak to the *Detroit News*. ECF No. 27-37. Chief Neumann, who conducted the PSI and wrote the report, was provided the email to the Regents as part of the materials to be reviewed during his investigation but does not connect Ashford's

17

violation of department policy to any statements other than those made in connection with the leak to the newspaper. Neumann did not review the communication to Defendants' HR department in conducting his investigation. At best, Ashford has inferential, circumstantial evidence suggesting that his discipline following the PSI was at least in part motivated by his other statements. But in general, the kinds of statements Ashford made to HR, the Board of Regents, and his chain of command are very similar to the statements he made to the *Detroit News*. This makes it difficult to parse whether he was disciplined for one or the other communication versus for speaking out in general. Given this uncertainty, there is an issue of material fact as to whether these in-house statements also motivated Ashford's disciplinary action.

### ii. Pretext

Defendants argue that, even if Ashford can make out a prima facie case, he cannot show that the stated reasons for his discipline are actually pretextual. ECF No. 22, PageID.165. Ashford states that the various involved parties' lack of knowledge regarding the information he was suspended for divulging is sufficient evidence of pretext. *Id*. at PageID.1706.

Ashford points to at least two pieces of evidence related to pretext. First, he correctly notes that individuals involved with the investigation could not testify to exactly what information Ashford was being suspended for divulging. *See* Evans Dep. 103:3-21, ECF No. 27-5,

PageID.1813 (stating "I can't remember" if he ever knew "what specific piece of information was improperly shared"); Gorski Dep. 198:19-200:25, ECF No. 23-4, PageID.747-49 (stating that Ashford was disciplined for "statement that our Department at the University of Michigan-Dearborn participated in a coverup of a crime" but not identifying the particulars of which statement he is referencing). Additionally, Ashford testified that Chief Gorski told him that he "did nothing wrong but tell the truth." Ashford Dep. 214:12-18, ECF No. 23-2, PageID.394. Although this evidence is thin, the Court finds that it raises at least an issue of fact as to whether the proffered reason in the PSI for his discipline—speaking to the *Detroit News* Reporter about department information—is pretextual, and that he was in fact being disciplined for speaking out through any number of channels, including internal ones, and questioning the Department's actions. The evidence noted raises at least an issue of fact as to whether the *Detroit News* leak alone was "insufficient to warrant" the eventual discipline he received.

Finding that the Ashford has raised at least a genuine issue of material fact regarding the elements of his Title IX retaliation claim, the Court will deny Defendants' motion as to Count II.

### C. Count III: Michigan Whistleblower Protection Act

To bring a claim under the Michigan WPA, a plaintiff "must show that (1) he was engaged in protected activity as defined by the act, (2) the defendant discharged [or discriminated against] him, and (3) a causal

connection exists between the protected activity and the discharge [or discrimination." *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998).

The WPA protects reports "to a public body." MCL 15.362. This includes state and municipal entities as well as any entity "primarily funded by or through state or local authority." MCL 15.361. A burden-shifting framework similar to *McDonnell-Douglas* applies: upon a prima facie showing of a claim, the defendants may then articulate a legitimate business reason for any discharge or discrimination. If they do so, the burden shifts to the plaintiff to provide evidence of pretext. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 629 (6th Cir. 2013) (quoting *Shaw v. City of Ecorse*, 770 N.W.2d 31, 37 (Mich. Ct. App. 2009)).

Defendants argue that (1) Ashford cannot show he engaged in protected activity because his statements to the *Detroit News* were not to a public body, and (2) that he cannot establish a causal connection between any other report and his suspension. ECF No. 22, PageID.166. Defendants largely repeat their arguments as related to the first two claims. ECF No. 27, PageID.1707.

This claim mirrors the Title IX claim: it can only apply to the statements Ashford made to his chain of command, to UM-Dearborn HR, and to the Board of Regents. The basis for the two claims is functionally the same, the parties have not articulated any substantive difference between the analysis of the two claims, and the Court has not found any

in its review of the caselaw. Having found genuine issues of material fact to maintain the Title IX retaliation claim at this stage, the Court finds that the WPA claim must also be maintained. Defendants' motion as to Count III is therefore denied.

### D. Count IV: Public policy

Ashford's last claim for relief is a tort claim under the public policy of the State of Michigan, sometimes phrased as "common law wrongful discharge," based on an implied right of action even when there is no other statutory recourse for an individual who feels they have been wrongfully terminated:

> The courts have also occasionally found sufficient legislative expression of policy to imply a cause of action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges. Such a cause of action has been found to be implied where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment.

*Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). Aside from "refusal to violate," a public policy claim can also be found if an employee suffers an adverse action for "exercising a right guaranteed by law" or "executing a duty required by law." *Kimmelman v. Heather Downs Mgmt. Ltd.*, 753 N.W.2d 265, 268 (Mich. Ct. App. 2008).

There is a distinction between this claim and the WPA claim: "when a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA, '[t]he WPA provides the exclusive remedy for such

retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity.'" *McNeill-Marks v. Midmichigan Med. Ctr.-Gratiot*, 891 N.W.2d 528, 540 (Mich. Ct. App. 2016) (quoting *Anzaldua v. Neogen Corp.*, 808 N.W.2d 804 (Mich. Ct. App. 2011)). In other words, Ashford cannot rely on his statements to internal stakeholders as the source of his public policy tort claim.

Ashford argues that the protected activity here is his refusal to "acquiesce" in the Department's ongoing violation of the law: falsely reporting the status of this case on the Clery Log. He contends that sufficient evidence shows that his employer was engaged in an ongoing effort to "stifle" his complaints and essentially force him to engage in allegedly unlawful behavior. ECF No. 27, PageID.1707.

This argument is a stretch: it would require the Court to find that Ashford's activities in relaying his concerns to the *Detroit News* (because none of the communications that are covered by the WPA can be covered by this claim) constituted a "refusal to violate the law." Courts have generally interpreted this standard to cover affirmative situations—for example, when an employer tells an employee to do something unlawful, and they refuse. *See, e.g., Trombetta v. Detroit, Toledo & Ironton R. Co.*, 265 N.W.2d 385, 388 (Mich. Ct. App. 1978) (recognizing public policy claim when plaintiff was terminated after "he refused to manipulate and adjust sampling results used for pollution control reports"). Here, there is no evidence that Ashford himself was forced to inaccurately report the

22

status on the case of the Clery Log even after his internal protests. And he was not in charge of the Clery Log reporting.

Courts have not differentiated between reporting of illegal activity to a public body and "refusing to conceal" illegal activity when the only manifestation of the refusal was the report. *McNeill-Marks*, 891 N.W.2d at 540 ("[W]e see no logical distinction between the refusal to conceal and the report by which that refusal manifested itself; rather, the two are flip sides of the same coin."). Reporting information to an outside body here is the same activity that would amount to refusing to conceal the information, it therefore may only be the subject of a claim under the WPA.  Defendant's motion as to Count IV is therefore granted.

## CONCLUSION

For all the reasons set out above, Defendants' Motion for Summary Judgment (ECF No. 55) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, summary judgment is **GRANTED** as to Count IV. Summary judgment is **DENIED** as to Counts I, II, and III.

**SO ORDERED**, this 18th day of October, 2022.


BY THE COURT:


s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

23