# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: January 09, 2024

Mr. Schuyler Ferguson
Mr. Brian M. Schwartz
Miller Canfield
150 W. Jefferson Avenue
Suite 2500
Detroit, MI 48226

Ms. Deborah L. Gordon
Ms. Elizabeth Ann Marzotto Taylor
Law Offices
33 Bloomfield Hills Parkway
Suite 220
Bloomfield Hills, MI 48304

Re:  Case No. 22-2057, *William Ashford v. University of Michigan, et al*
Originating Case No. : 2:20-cv-10561

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

WILLIAM ELLIOTT ASHFORD,

　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

UNIVERSITY OF MICHIGAN; UNIVERSITY OF MICHIGAN-
DEARBORN; GARY GORSKI; JEFFREY EVANS,

　　　　　　　　　*Defendants-Appellants.*

No. 22-2057

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10561—Terrence George Berg, District Judge.

Argued: October 25, 2023

Decided and Filed: January 9, 2024

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Brian M. Schwartz, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Detroit, Michigan, for Appellants. Elizabeth Marzotto Taylor, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellee. **ON BRIEF:** Brian M. Schwartz, Schuyler A. Ferguson, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Detroit, Michigan, for Appellants. Elizabeth Marzotto Taylor, Deborah L. Gordon, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellee.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge. In late 2019, William Ashford ("Ashford"), a police officer employed by the University of Michigan-Dearborn ("UM-D"), spoke with a

reporter at *The Detroit Times* about his concerns that the UM-D police department was mishandling a student's allegation that one of her professors had sexually assaulted her. After his supervisors at the University, including then-Vice Chancellor Jeffrey Evans ("Evans") and UM-D Police Chief Gary Gorski ("Gorski"), learned that he had taken his thoughts about the case to the media, they launched an inquiry into his actions in November 2019. At the conclusion of their investigation, UM-D suspended Ashford for ten days without pay. Ashford sued UM-D, the University of Michigan, Evans (in his individual and official capacities) and Gorski (in his individual and official capacities), bringing a 42 U.S.C. § 1983 First Amendment claim[1] that he had been unconstitutionally retaliated against for engaging in protected speech. Ashford sought to have the suspension removed from his employment record, as well as monetary damages.

The defendants argued in a motion for summary judgment that Ashford's suit against the university and its officers in their official capacities was barred by Eleventh Amendment sovereign immunity, and that the officers in their individual capacities were entitled to qualified immunity. The district court denied their motion with respect to both sovereign and qualified immunity. In this interlocutory appeal, the defendants ask this court to reverse the district court's decision. We AFFIRM the district court's ruling on sovereign and qualified immunity.

## I. BACKGROUND

### A. Factual Background

Ashford started working for UM-D as a police officer on May 22, 2017. R. 23-18 (Ashford Offer Letter at 1) (Page ID #1133). He had previously worked at the Detroit Police Department since 1995 and had been a detective in the sex-crimes unit since June 2015. R. 26-3 (Ashford Resume at 1) (Page ID #1247). After a probationary year with UM-D, Ashford received full university benefits, as well as a copy of the department's collective bargaining agreement, which included the discrimination and harassment policy, the standard of conduct policy, and the professional standards investigation ("PSI") policy. R. 23-2 (Ashford Dep. at 69–

---

[1]Ashford raised other claims in his complaint, but the only issue before us on appeal is his § 1983 First Amendment retaliation claim.

70) (Page ID #249–50). UM-D never provided him with any formal training about nondiscrimination, non-harassment, or nonretaliation, and he was not aware of the specific policies in place regarding public statements, endorsements, and/or appearances by UM-D employees. *Id.* at 74 (Page ID #254). Other than the discipline at issue in this case, Ashford has not received any other formal discipline from UM-D. *Id.* at 88 (Page ID #268).

On February 28, 2019, a UM-D student reported to the UM-D Police Department that Professor Jay Stasser ("Stasser") had sexually assaulted her on February 25, 2019, and had requested oral sex in exchange for a grade adjustment. R. 26-8 (Email—Info. on UM Dearborn CSC) (Page ID #1374); R. 23-8 (Case Report at 3) (Page ID #1078). On March 1, 2019, Deputy Chief Timothy Wiley ("Wiley") gave Ashford an overview of the situation involving Stasser. R. 23-2 (Ashford Dep. at 108) (Page ID #288). Ashford asked if they had interviewed the victim, and Wiley told him that they did not take statements from victims, because it can "come back to haunt [the department] in court." *Id.* at 109 (Page ID #289). Wiley informed Ashford that then-Captain (now-Deputy Chief) James Knittel ("Knittel") and Officer Fred Thompson ("Thompson") were going to interview Stasser at his home. *Id.* Ashford advised that an interview like that should be done in a controlled atmosphere, although it does not appear that Wiley heeded his advice. *Id.* at 109–10 (Page ID #289–90).

Ashford was not brought onto the case, because Wiley wanted to avoid "too many chefs in the kitchen." *Id.* Ashford also had not been involved in any other sexual-assault cases on UM-D's campus, nor did he have knowledge of the "usual procedures" that the UM-D Police Department followed in such cases. *Id.* at 110–11 (Page ID #290–91). He was not asked "at any point" to play any role in the investigation against Stasser. *Id.* at 111 (Page ID #291). He did know that the UM-D Police interviewed Stasser, who admitted to engaging in "inappropriate sexual contact" (fellatio that Stasser "deemed to be consensual"). *Id.* Knittel, Thompson, and a University of Michigan-Ann Arbor officer conducted the interview. *Id.* at 112 (Page ID #292).

Ashford believed that the UM-D Police Department would be the lead on the sexual-assault case against Stasser, based on their "investigative efforts" and obtaining of search warrants. *Id.* at 116 (Page ID #296). In May 2019, at the UM-D Police Department's annual training in Ann Arbor, Wiley and Knittel announced that the "case was closed and . . . a warrant

was submitted to the prosecutor's office." *Id.* at 116–17, 122 (Page ID #296–97, 302). Ashford testified that this announcement "led [him] to believe they handled the investigation," and, by submitting the warrant package to the Wayne County Prosecutor's Office ("WCPO"), that the University had in fact completed the investigation. *Id.* at 117 (Page ID #297). The UM-D Police Department's Clery log[2] reflected that the case's status as of August 27, 2019 (Case No. 19-047) was "Closed-Ref to WCPO." R. 26-14 (Clery Log Aug. 2019) (Page ID #1518).

At some point after the May 2019 meeting, Ashford began to worry that the UM-D Police Department was not doing anything with the information and evidence that they had collected in this case. On September 4, 2019, he spoke with Assistant Prosecuting Attorney David Champine ("Champine"), who heads the WCPO's sexual-assault unit. R. 23-2 (Ashford Dep. at 141–42) (Page ID #321–22). At this point, Champine informed Ashford that he had never received a warrant package from UM-D's police department regarding this sexual-assault case. *Id.* Immediately after speaking with Champine, Ashford brought his concerns to Gorski. *Id.* at 143 (Page ID #323). Gorski was relatively new to the department and had not been chief at the time of the sexual assault or at the time of the meeting where Wiley and Knittel reported that the matter had been referred to WCPO. *Id.* at 168–69 (Page ID #348–49). During this conversation, Ashford asked Gorski about any agreement between the UM-D and City of Dearborn police departments, and Gorski told him there was "no such agreement" and that each entity handled its own cases. *Id.* at 143 (Page ID #323). Gorski also confirmed he had a "case update" from Knittel "informing him that the case was closed and submitted to" the WCPO. *Id.* at 143–44 (Page ID #323–24). Ashford expressed his concerns that the sexual-assault statistic would not be "reported accurately" at this time based on what the Clery log reflected, *id.* at 145 (Page ID #325), and told Gorski that he believed Knittel was part of a "coverup," R. 23-4 (Gorski Dep. at 56) (Page ID #605).

Shortly after this September 4, 2019 meeting between Gorski and Ashford, Gorski told Ashford he had spoken with Knittel, who had acknowledged that the warrant was not with the

---

[2]The Clery Act requires all colleges and universities receiving federal funding to "prepare, publish, and distribute" public annual safety reports (Clery logs), which must include statistics of campus crime, including sex offenses, for "the most recent calendar year, and during the 2 preceding calendar years[.]" 20 U.S.C. § 1092(f).

WCPO. R. 23-2 (Ashford Dep. at 152) (Page ID #332). Gorski testified that when he looked into the issue, he found that the evidence was "turned over to the Dearborn Police Department, and that they were the lead," and that they were waiting for DNA results. R. 23-4 (Gorski Dep. at 62) (Page ID #611). This struck Ashford as odd, because he did not think they needed to wait for the DNA results when Stasser had already admitted to the sexual contact and other evidence had been collected. R. 23-2 (Ashford Dep. at 152–53) (Page ID #332–33). On September 10, 2019, Ashford went to Alana Dillard-Slaughter in the UM-D human resources department with his concerns. *Id.* at 154 (Page ID #334). On or around September 16, 2019, he also sent an anonymous letter to the University of Michigan Board of Regents, in hopes that it would "stoke the fires" and make them address the matter. *Id.* at 165 (Page ID #345). He did not receive any follow-up from the Board of Regents. *Id.* at 171–72 (Page ID #351–52). Additionally, on October 24, 2019, Ashford sent an email to the WCPO, expressing his concerns that nearly six months had passed since the assault had occurred and no warrant had been submitted yet. R. 27-28 (Ashford Letter to WCPO) (Page ID #2118–20).

At some point between September 4, 2019, and October 11, 2019, an undisclosed person contacted George Hunter ("Hunter"), a reporter for *The Detroit News*, about the Stasser case. R. 23-2 (Ashford Dep. at 172–73) (Page ID #352–53). On October 11, 2019, Hunter submitted a Michigan Freedom of Information Act ("FOIA") request to the University of Michigan for: (1) information about Jay Stasser; and (2) "all University of Michigan-Dearborn Cleary [sic] logs for 2019." R. 26-25 (Hunter FOIA Request) (Page ID #1585). On or around October 16, 2019, and after Hunter had submitted his FOIA request, Gorski instructed Knittel to change the status of the Stasser case in UM-D's Clery log to "open investigation" by both the UM-D Police Department and the Dearborn police. R. 23-4 (Gorski Dep. at 133–34) (Page ID #682–83); R. 26-26 (Clery Log Oct. 18, 2019) (Page ID #1587). Ashford claims that it "should have never been changed" and was updated only because he had brought it to their attention by speaking with Gorski, Alana Dillard-Slaughter, the Board of Regents, and the WCPO. R. 23-2 (Ashford Dep. at 186–87) (Page ID #366–67). On October 25, 2019, the WCPO received a warrant request on the case—nearly two months after Ashford had brought his concerns to Gorski. R. 23-4 (Gorski Dep. at 215–16) (Page ID #764–65).

In late October 2019, Hunter, having already spoken with the undisclosed individual, contacted Ashford and asked to speak with him. R. 23-2 (Ashford Dep. at 172–74) (Page ID #352–54). Ashford provided Hunter with the date the case was reported, the log (that was ultimately published in the paper), the letter that Ashford had submitted to the Board of Regents, along with other information about the case (including information that Ashford states "could not be attained by the public," although he goes on to say that he did not provide Hunter with the witness interview reports or the investigative file, and that there was "nothing . . . in that police report" that the public could not get). *Id.* at 174–76 (Page ID #354–56).

On November 3, 2019, Hunter published an article in *The Detroit News*, reporting that a staffer had accused UM-D of attempting to cover up a student's claims that they were sexually assaulted by a UM-D professor. R. 27-23 (*The Detroit News* Article) (Page ID #2102–09). The article does not identify Stasser, the student, or Ashford by name or any other features. *Id.* On November 4, 2019, Ashford met with Gorski and acknowledged that he had been the person who provided the information to the paper. R. 23-2 (Ashford Dep. at 195–98) (Page ID #375–78). During this meeting, Gorski also told Ashford that they needed to "circle [their] wagons around the university," because it could not look like the university had an "unsafe campus environment." *Id.* at 197 (Page ID #377). Gorski told Ashford that his job was not in jeopardy. *Id.* at 201 (Page ID #380). Gorski also asked Ashford to prepare a memo with more specifics, but the UM-D union representative informed Gorski that he first would have to perform a PSI investigation. R. 23-4 (Gorski Dep. at 164–65) (Page ID #713–14). Gorski contacted the University's Division of Public Safety and Security Administration Unit, and concluded on November 6, 2019 that the "best way to move forward" would be to initiate a PSI process. R. 26-34 (Discussion with Oesterle and Ede) (Page ID #1622). On November 25, 2019, Gorski submitted his complaint against Ashford for "divulg[ing] information obtained from an open UMD . . . investigation" that was "not authorized to be released." R. 26-35 (Compl. Against Ashford) (Page ID #1624). Ashford received notice of the PSI the same day. R. 26-36 (Ashford PSI Notice) (Page ID #1626).

Chief Robert Neumann ("Neumann") from the University of Michigan-Ann Arbor Police Department conducted Ashford's PSI, R. 27-37 (PSI Narrative Summ.) (Page ID #2155–76), and

submitted his final report to Gorski, *see* R. 23-7 (Final Disposition of PSI, Jan. 29, 2020) (Page ID #1034–35).  Gorski sustained the allegation that Ashford had violated the UM-D Department of Police and Public Safety Policy for the Standards of Conduct by making statements that could "be interpreted as intending to have an adverse effect upon department morale, discipline, operation . . . , or perception of the public," and "[d]ivulg[ing] . . . information gained by reason of [his] position for anything other than its official authorized purpose." *Id.* at 1 (Page ID #1034).  That same day, Ashford had a meeting with Gorski, Alana Dillard-Slaughter, and Wayne Bierbower, at which they informed him that the allegations were sustained.  R. 23-2 (Ashford Dep. at 211–12) (Page ID #391–92).  He was given a ten-day Disciplinary Layoff without pay, R. 23-7 (Final Disposition of PSI, Jan. 29, 2020) (Page ID #1034–35), during which his UM-D email privileges and access to the office were suspended, *id.* (Notice of Disciplinary Layoff, Jan. 29, 2020) (Page ID #1033).  Others had recommended termination.  R. 23-4 (Gorski Dep. at 194–95) (Page ID #743–44).  Ashford served out his suspension and continues to work at the UM-D Police Department.

## B.  Procedural Background

Ashford sued the University of Michigan-Dearborn and University of Michigan (collectively, "the University"), Gorski, and Evans (who was serving as Vice Chancellor during the relevant time period, but has since left that post), the latter two in both their individual and official capacities.  He seeks legal relief in the form of compensatory, economic, and noneconomic damages; a judgment for lost wages and benefits (past and future); exemplary damages; punitive damages; and attorney fees and costs.  He also seeks declaratory and equitable relief in the form of an order requiring the Defendants to remove from his record any discipline related to the claims in this case (namely, the ten-day suspension), an injunction prohibiting any further acts of discrimination, intimidation, or retaliation, and attorney fees.  R. 1 (Compl. at 26) (Page ID #26).

The Defendants filed a motion for summary judgment on all of Ashford's claims.  R. 22 (Def. Mot. Summ. J.) (Page ID #131).  Relevant on appeal, the Defendants argued:  (1) that Ashford's claims against the University, and the university officers in their official capacities, are barred by sovereign immunity; and (2) that Gorski and Evans have qualified immunity for

the claims against them in their individual capacities. *Id.* at 12, 14 (Page ID #155, 157). The district court found that sovereign immunity does not bar Ashford's claim, because he seeks prospective relief from the appropriate parties (the University and the university officials in their official capacities). *Ashford v. Univ. of Mich.*, 635 F. Supp. 3d 593, 600 (E.D. Mich. 2022). In their argument that Gorski and Evans are entitled to qualified immunity, the Defendants asserted that Ashford had not specifically alleged that Gorski and Evans were involved in retaliating against him and had not sufficiently established that they had violated his clearly established constitutional rights. R. 22 (Def. Mot. Summ. J. at 14–15) (Page ID #157–58). The district court noted that Gorski and Evans had both testified about their involvement with or knowledge of Ashford's investigation and suspension, stated that there was at least "a factual question about whether their direct actions were sufficiently connected to [Ashford's] discipline," and concluded that the court could not find Gorski and Evans were entitled to qualified immunity because their actions clearly violated Ashford's well-established constitutional right to free speech. *Ashford*, 635 F. Supp. 3d at 603. The University, Gorski, and Evans now bring an interlocutory appeal of the district court's denial of sovereign and qualified immunity.

## II. DISCUSSION

### A. Sovereign Immunity

#### 1. Summary-Judgment Standard

Generally, interlocutory rulings like a denial of summary judgment are not immediately appealable, and parties must wait for the district court to issue a final judgment before appealing. *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016). Denials of qualified immunity to public officials, however, are immediately appealable under the "collateral order" doctrine, "to the extent they raise legal questions." *In re Flint Water Cases*, 960 F.3d 303, 322 (6th Cir. 2020); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 905–06 (6th Cir. 2009). The collateral-order doctrine also grants us jurisdiction over a district court's denial of sovereign immunity. *In re Flint Water Cases*, 960 F.3d at 322.

We review de novo a district court's legal decision to grant or deny a motion for summary judgment on the basis of sovereign (absolute) or qualified immunity. *Barnes v.*

*Wright*, 449 F.3d 709, 714 (6th Cir. 2006). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, we must view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Barnes*, 449 F.3d at 714.

### 2. Sovereign immunity does not bar Ashford's claim for prospective relief

The Eleventh Amendment prohibits suits against states unless they consent to be sued or Congress, pursuant to a valid exercise of its power, unequivocally expresses its intent to abrogate sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–99 (1984); *Morgan v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023). The doctrine of sovereign immunity extends to entities acting on behalf of the state, as well as to state officers acting in their official capacity. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). We have previously held that the University of Michigan is a state agency and is therefore entitled to claim sovereign immunity. *Estate of Ritter by Ritter v. Univ. of Mich.*, 851 F.2d 846, 851 (6th Cir. 1988).

Sovereign immunity precludes suits against states and their entities or officers for monetary damages or retrospective relief but permits claims for prospective relief when brought against state officers in their official capacities. *Ex parte Young*, 209 U.S. 123, 159–60 (1908); *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). "[T]he bottom line" in determining if sovereign immunity bars a suit is whether granting the relief being sought would "impose a liability which must be paid from public funds in the state treasury." *Thomson v. Harmony*, 65 F.3d 1314, 1320 (6th Cir. 1995) (quoting *Edelman*, 415 U.S. at 663).

Here, Ashford is suing Gorski and Evans (state actors) in their official capacities for an injunction against future retaliation and discrimination and for an expungement of his record. Gorski and Evans claim that sovereign immunity precludes Ashford from prevailing on this claim, because he seeks retrospective relief.

We have held that expunging disciplinary records is, as a practical matter, prospective relief. *See Morgan*, 63 F.4th at 516–17; *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992). In this part of his claim, Ashford does not seek monetary damages or any type of retrospective relief. Rather, he requests an injunction against any future retaliation and discrimination, and for all discipline related to the claims in this case to be removed from his record at a job he continues to hold. He alleges that he has been instructed that "further behaviors of this nature" will result in escalating discipline, including termination, R. 1 (Compl. at ¶ 83) (Page ID #16), indicating that, without relief, the constitutional violation alleged will continue to affect him at his place of work. Looking to the "bottom line" in our Eleventh Amendment jurisprudence, granting Ashford his requested relief would incur expenses that are, at most, "minimal and ancillary" to Ashford's main goals of preventing future discrimination and retaliation and removing negative disciplinary entries from his record. *Thomson*, 65 F.3d at 1320–21. The district court did not err in denying the Defendants' motion for summary judgment based on sovereign immunity.

Gorski and Evans also reiterate their argument on appeal that Evans "cannot be sued for injunctive relief as he is no longer an employee of the University." Appellants Br. at 20. However, with respect to a claim against an officer in their official capacity, the suit may proceed against whoever has replaced Evans in his role as Vice Chancellor. *See Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985); Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c). We leave it to the district court on remand to enter an appropriate order of substitution.

## B. Qualified Immunity

### 1. Standard of Review

As with sovereign immunity, the collateral-order doctrine grants us jurisdiction to consider an interlocutory appeal for the denial of qualified immunity to public officials, to the extent that an issue involves a pure question of law. *In re Flint Water Cases*, 960 F.3d at 322. In determining whether an official is entitled to qualified immunity, we look at: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established" at the time of the violation.

*Bazzi v. City of Dearborn*, 658 F.3d 598, 606–07 (6th Cir. 2011) (quoting *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006)); *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001). We have discretion over which of the two questions we answer first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In appeals of rulings on motions for summary judgment, we "adopt the district court's recitation of the facts," *Gillispie v. Miami Township*, 18 F.4th 909, 912 (6th Cir. 2021) (citing *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020)), and "cast[] them in the light most favorable to" the non-moving party, *id.* (citing *Jackson v. City of Cleveland*, 925 F.3d 793, 803 (6th Cir. 2019)).

Before we turn to the merits of the district court's ruling on qualified immunity, though, we must ensure that we have jurisdiction to hear an appeal of this issue. Gorski and Evans claim that Ashford failed to establish with the requisite specificity that they were involved in his suspension. Appellants Br. at 16, 23–24. The district court noted that both individuals appeared to have testified about at least enough involvement in penalizing Ashford for there to be "a factual question," before it denied their qualified-immunity claims. *Ashford*, 635 F. Supp. 3d at 603. To the extent that there does exist a factual dispute regarding Gorski's and/or Evans's involvement in penalizing Ashford, we lack the jurisdiction to resolve that issue, and leave it to the district court on remand. *See, e.g.*, *Gillispie*, 18 F.4th at 917. On appeal, however, Gorski and Evans also argue that they are entitled to qualified immunity because penalizing Ashford for his actions did not violate clearly established law. Appellants Br. at 21–23. Because addressing this issue will not require us to resolve any genuine dispute of material fact, we have jurisdiction to consider this purely legal question, and we do so below. *See, e.g.*, *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 472 (6th Cir. 2014) (stating that even when an individual raises impermissible disputes of fact, if they "also raise[] the purely legal issue of whether the plaintiff's facts show that [an individual] violated clearly established law, 'then there is an issue over which this court has jurisdiction[]'" (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013))).

**2. Ashford engaged in private protected speech when he spoke with the reporter, and was retaliated against for doing so**

Before turning to our qualified-immunity analysis, we must determine: (1) whether Ashford engaged in protected speech as a private citizen when he spoke with *The Detroit News*; and (2) whether a reasonable jury could find that he was retaliated against for doing so.

To determine whether a public employee like Ashford has engaged in private protected speech, we engage in a three-part inquiry: (1) was the relevant speech on a matter of public concern; (2) was the employee's speech made pursuant to their official duties; and (3) did the employee's interest in speaking, on balance, outweigh the government's interest in promoting an efficient workplace and providing public services ("*Pickering*" balancing). *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021). Applying these three factors to Ashford's speech to *The Detroit News*, we conclude that our precedent clearly establishes that speech like Ashford's constitutes protected speech.

**a. Ashford's speech was on a matter of public concern**

Determining whether speech was on a matter of public concern requires us to examine its "content, form, and context." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). We have held that statements reporting "instances of maladministration, to authorities both within and outside of [an employee's] chain of command[,]" constitute speech on a matter of public concern. *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019). Within the public's interest in the government's effectiveness, how police departments operate is an "obvious[]" public concern. *Solomon v. Royal Oak Township*, 842 F.2d 862, 865 (6th Cir. 1988) (citing *McMurphy v. City of Flushing*, 802 F.2d 191, 196 (6th Cir. 1986)). We have noted in the past that a public employee "simply respond[ing] to questions regarding an existing controversy," rather than soliciting the media's attention, can serve as a strong indicator that their speech was on a matter of public concern. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988).

Ashford's speech to Hunter was about Ashford's perception that the UM-D Police Department was covering up a UM-D student's sexual-assault allegations against one of her professors. This type of speech, concerning a police department's apparent mishandling of a

sexual-assault case, falls squarely within what we have deemed a matter of public concern. Ashford also did not actively reach out to a news outlet. Rather, he agreed to speak with reporter Hunter after an unnamed individual gave Ashford's information to Hunter, and Hunter in turn called Ashford to see if he would be willing to talk about the matter. The content and context of the speech suggest that Ashford's speech to *The Detroit News* was about a matter of public concern. *See Buddenberg*, 939 F.3d at 739.

### b. Ashford's speech was not made pursuant to his ordinary official duties

Employee speech made on a matter of public concern is still unprotected if it was "made pursuant to [an employee's] official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). Whether speech falls within a public employee's official duties does not turn solely on whether the speech contained information they obtained as a result of their employment, *Lane v. Franks*, 573 U.S. 228, 239–40 (2014), but depends primarily on whether the speech is "ordinarily within the scope of an employee's duties," *Boulton v. Swanson*, 795 F.3d 526, 533–34 (6th Cir. 2015) (quoting *Lane*, 573 U.S. at 240). To determine whether speech was made pursuant to a public employee's ordinary job duties, we look to factors like the speech's "impetus," setting, audience, and general subject matter. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007).

Speech made outside an individual's chain of command is less likely to be within an employee's ordinary job responsibilities, as is speech that an employee's ordinary job responsibilities would not require them to make. *Buddenberg*, 939 F.3d at 740 (stating that an individual who reported employee conduct outside of her chain of command when her ordinary duties did not require her to do so was "less likely to be [speaking] within" the scope of her ordinary job responsibilities); *Westmoreland v. Sutherland*, 662 F.3d 714, 716, 719–20, 722 (6th Cir. 2011) (noting that a firefighter's speech was not made "pursuant to a task that was within the scope of his official duties," but rather "as a citizen on a matter of public concern," when he spoke as an expert while out of uniform and off-duty at a town meeting about the city's decision to cut funding for certain safety devices). Conversely, we have viewed internal escalations of concerns or grievances as insufficient to establish private speech when the speech directly relates to or otherwise concerns an employee's day-to-day duties. *Mayhew v. Town of Smyrna*,

856 F.3d 456, 464–65 (6th Cir. 2017) (emphasizing that an individual's job description required them to report certain situations and accidents to management in finding that his reporting of misconduct up his chain of command was speech within the scope of his ordinary responsibilities); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (ruling that a handler for the police department's canine unit spoke pursuant to his official duties when he submitted an internal memo solely to his supervisor, criticizing cutbacks in canine training).

        In Ashford's case, he was hired by the UM-D Police Department as a general police officer.  Although he had experience on a sex-crimes unit from his time with the Dearborn Police Department, R. 26-3 (Ashford Resume) (Page ID #1247), UM-D did not hire him as any type of specialist in that area.  His job duties also never involved liaising or otherwise interacting with the media, reporters, or individuals outside of the UM-D Police Department (and, in fact, he stated he never received training in this area).  *See* R. 23-18 (Ashford Offer Letter) (Page ID #1133); R. 23-2 (Ashford Dep. at 74, 228) (Page ID #254, 408) (stating, in part, that he decided to speak with Hunter because his attempts to bring the investigation's failures to his supervisors' attention were unsuccessful, and his duty as a civilian had stepped in).  At no point was Ashford brought in to work on the Stasser case, nor was he involved in any other way.  R. 23-7 (PSI Follow-Up, Interview of Ashford, Dec. 11, 2019 at 2) (Page ID #1053).  The greatest exposures Ashford had to the case before he brought his concerns to Gorski were receiving information from Wiley that the matter existed on March 1, 2019, and hearing the update in May 2019 that the case was "closed."  At the point that Ashford agreed to speak with *The Detroit News*, his audience was not his supervisors at UM-D, but the general public—and he was speaking about the police department's efficiency, an issue that we have identified as one of great public interest.  *See Solomon*, 842 F.2d at 865; *McMurphy*, 802 F.2d at 196.

        In their motion for summary judgment and on appeal, Gorski and Evans focused their attention on the fact that Ashford was speaking about information that "owed its existence to his professional responsibilities and role as a DPS police officer."  R. 22 (Def. Mot. Summ. J. at 18) (Page ID #161); Appellants Reply Br. at 9.  However, *Lane v. Franks* makes clear that this is not dispositive of whether speech was made within the scope of employment.  573 U.S. at 240.  On appeal, Gorski and Evans make no additional argument that Ashford was put on or otherwise

involved with the investigation, nor do they assert that his ordinary job responsibilities included speaking with the media, reporters, or other external actors. In fact, they allege in their brief that Ashford "did not, at any point, play a role in the Investigation," and instead "inserted himself into the Investigation." Appellants Br. at 9–10. The district court did not err, based on the evidence presented on summary judgment, in finding that Ashford's speech to Hunter was made outside of his ordinary job responsibilities. *Ashford*, 635 F. Supp. 3d at 601–02.

### c. *Pickering* balancing favors Ashford's interest over the government's

Finally, we must weigh whether Ashford's interest in speaking with the media about his concerns outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Buddenberg*, 939 F.3d at 739 (quoting *Mayhew*, 856 F.3d at 462). Here, Gorski and Evans claim that "police departments have 'an interest in maintaining an effective police force, free from internal division,'" quoting our unpublished opinion in *Graham v. City of Mentor*, 118 F. App'x 27, 30 (6th Cir. 2004). Appellants Reply Br. at 11. However, we have also stated that "public safety employers [do not] have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests." *Mosholder v. Barnhardt*, 679 F.3d 443, 451 (6th Cir. 2012). Gorski and Evans do not, pursuant to our precedent, have any greater interest in regulating employee speech to promote their force's efficiency than does any other government employer.

Ashford has an interest in engaging in speech on matters of public concern, and the public additionally has an interest in hearing speech about how their police departments are handling cases. *See, e.g.*, *Myers v. City of Centerville*, 41 F.4th 746, 760–61 (6th Cir. 2022). No one in the UM-D Police Department reported that "their morale was adversely affected" by Ashford's actions. R. 23-4 (Gorski Dep. at 201) (Page ID #750). Nor did anyone say that Ashford talking with Hunter "had an adverse effect upon Departmental discipline or operation." *Id.* at 201–02 (Page ID #750–51). Absent a significantly stronger showing by Gorski and Evans that Ashford's speech has burdened the UM-D Police Department, *Pickering* balancing supports Ashford's free speech interests.

The evidence on summary judgment suggests that Ashford's speech was on a matter of public concern, was not made pursuant to his official or day-to-day duties, and was not shown to disrupt any important governmental interests. Gorski and Evans do little to argue that Ashford's speech was not protected, other than alleging that this right was not clearly established at the time Ashford spoke to Hunter, Appellants Br. at 21–23, which we address in further detail below.

### 3. Ashford's retaliation claims survive summary judgment

In light of the showing that Ashford engaged in protected speech as a private citizen when he spoke with Hunter, we now turn to whether he has sufficiently established that he was retaliated against for doing so. Making a prima facie case of retaliation requires showing that: "(1) [Ashford] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Once the prima facie case is made out, the burden shifts to the defendants to show, by a preponderance of the evidence, that Ashford would have been suspended even if he had not spoken with Hunter. *Id.*

Ashford engaged in constitutionally protected speech in talking with *The Detroit News*. As a result, UM-D subjected him to an investigation and ultimately suspended him for ten days without pay. R. 23-7 (Notice of Disciplinary Layoff) (Page ID #1033). Ashford has expressed the belief that he faced "the threat that [he] would be terminated if [he] continued this matter or took it any further than what they did." R. 23-2 (Ashford Dep. at 227) (Page ID #407). On appeal, Gorski and Evans do not contest that Ashford received a suspension. A person of "ordinary firmness" would view a ten-day suspension without pay as an adverse action that deters future, similar speech. *See Dye*, 702 F.3d at 304 ("The lack of a steady income . . . could certainly chill or silence a person of ordinary firmness."); *see also Benison v. Ross*, 765 F.3d 649, 660 (6th Cir. 2014) (stating that penalties that "'impose[] a . . . financial burden' on the plaintiffs" constitute adverse action (quoting *Dye*, 702 F.3d at 304)). Finally, there is a sufficient

causal link between Ashford's protected conduct and his suspension, given the fact that the PSI's Final Disposition cites Ashford speaking with *The Detroit News* as the support for UM-D's decision to suspend him.  R. 23-7 (Final Disposition of PSI) (Page ID #1034).

The burden then shifts to Gorski and Evans to show by a preponderance of the evidence that they would have suspended Ashford without pay regardless of whether he had spoken to Hunter.  Gorski and Evans fall well short of carrying this burden, because they concede on appeal that Ashford's suspension was motivated by his speaking with Hunter.  *See* Appellants Br. at 21–24; *see also* R. 23-7 (Final Disposition of PSI) (Page ID #1034).  Because Ashford has made a sufficient showing that he engaged in protected speech and was penalized for doing so, a jury could find in his favor on his retaliation claims.

### 4. It is clearly established law in this circuit that public employers cannot retaliate against their employees for engaging in protected speech

The district court found that Gorski and Evans did not "dispute that Ashford had a clearly established right to exercise his free speech rights without retaliation," and subsequently denied their motion for summary judgment based on qualified immunity.  *Ashford*, 635 F. Supp. 3d at 603.  On appeal, Ashford argues that the Defendants have now forfeited their argument that his right was not clearly established under our precedent.  Appellee Br. at 39–40 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)))).

In their motion for summary judgment, Gorski and Evans made little effort to connect the facts in the record to our two-pronged test for qualified immunity.  *See* R. 22 (Def. Mot. Summ. J. at 14–15) (Page ID #157–58).  Although they argued that Ashford's speech was not constitutionally protected, addressing *Saucier*'s first prong, they did not appear to relate this argument to qualified immunity's second step:  whether a reasonable officer would have known that retaliation in this context would violate clearly established law.  *Id.* at 15–20 (Page ID #158–63); *see Saucier*, 533 U.S. at 202.  On appeal, they do little more than assert that in this very specific context (a police officer receiving a ten-day suspension without pay for "violat[ing]

department policy by leaking confidential information about an active investigation and by refusing to comply with an order from a superior officer"), Gorski and Evans "acted reasonably in believing that" Ashford had not engaged in protected speech. Appellants Br. at 22; *see also* Appellants Reply Br. at 8–9. Given the Defendants' scant treatment of this issue, both before the district court and now on appeal, we hold that they forfeited the argument that our precedent had not clearly established that Ashford was engaging in constitutionally protected speech.

Even if this argument were not forfeited, though, there is no doubt that there is a clearly established constitutional right to speak, even as a government employee, on a matter of public concern regarding issues outside of one's day-to-day job responsibilities, absent a showing that *Pickering* balancing favors the government's particular interest in promoting efficiency or public safety. *Buddenberg*, 939 F.3d at 739–40 (finding speech alleging "public corruption . . . [and] not within [the employee's] ordinary job responsibilities" was "protected by the First Amendment" when "'the relevant government entity [did not have] an adequate justification for treating the employee differently from any other member of the general public'" (quoting *Garcetti*, 547 U.S. at 418)); *Westmoreland*, 662 F.3d at 718–19. And it is well settled in our circuit that retaliating against an employee for exercising this free speech right violates the Constitution. *Buddenberg*, 939 F.3d at 741 ("We have long recognized that a public employer may not retaliate against an employee for her exercise of constitutionally protected speech."); *See v. City of Elyria*, 502 F.3d 484, 495 (6th Cir. 2007) (stating that at the time of an employee's discipline in 2002, it was "settled" that a public employee had the "right to speak on matters of public concern without facing improper government retaliation"); *Hoover v. Radabaugh*, 307 F.3d 460, 469 (6th Cir. 2002) ("[A]s a matter of pure law, the rights here are clearly established: a reasonable official would know that terminating an employee with the motivation, even in part, of quieting the plaintiff's public speech about the illegal activities of the Department violates the Constitution.").

Viewing the facts in the light most favorable to Ashford, as the non-moving party, Ashford has shown that he was engaging in protected speech when he spoke to Hunter about the UM-D's missteps in handling a sexual-assault case. Reasonable officers should have known that penalizing him for doing so would violate his First Amendment rights. Because Ashford's rights

were clearly established at the time he was suspended without pay, we hold that the officers involved in his suspension are not shielded by qualified immunity.

### III. CONCLUSION

On the record before us, Ashford engaged in protected private speech when he agreed to speak with a reporter about the UM-D Police Department's handling of a sexual assault. He has made out a sufficient showing that he was retaliated against for doing so, which violated a clearly established right under our precedent. In seeking a remedy for his suspension now, Ashford has requested prospective relief from the state officers in their official capacities, in the form of an expungement of his record and an injunction preventing them from engaging in any future retaliation or discrimination. Sovereign immunity does not bar this claim from proceeding. Likewise, qualified immunity does not shield from liability the individual officers involved in violating Ashford's constitutional rights, because it is clearly established law that public employees speaking outside of the scope of their responsibilities on a matter of public concern are engaging in protected speech as private citizens. For the foregoing reasons, we AFFIRM the district court's denial of the Defendants' motion for summary judgment based on sovereign and qualified immunity.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-2057

WILLIAM ELLIOTT ASHFORD,

     Plaintiff - Appellee,

     v.

UNIVERSITY OF MICHIGAN; UNIVERSITY OF
MICHIGAN-DEARBORN; GARY GORSKI; JEFFREY
EVANS,

     Defendants - Appellants.

```
                                    ┌──────────────────────────┐
                                    │          FILED           │
                                    │       Jan 09, 2024       │
                                    │  KELLY L. STEPHENS, Clerk │
                                    └──────────────────────────┘
```

Before: MOORE, GIBBONS, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Defendants' motion for summary judgment based on sovereign and qualified immunity is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk