to cover up the sexual assault of the faculty member. The next day Plaintiff was told by the Chief that “[W]e need to circle our wagons around the University…[it] cannot be made to look like it has an unsafe campus environment, and we need to get ahead of that.” **A**, 197.

In retaliation, on January 29, 2020 Plaintiff was suspended for ten days for alleged rule violations. But there were none– Defendants’ arguments to the contrary create, at best, a question of fact. The officers responsible for the false reporting, which continued even after Plaintiff showed their falsity, were never investigated, or disciplined in the face of their own clear rule violations and dereliction of duty. Defendants’ arguments fail. Plaintiff was clearly speaking as a citizen on a matter of significant public concern. Speech is not transformed into employee—rather than citizen—speech merely because it concerns information acquired by virtue of the speaker’s public employment. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 463 (6th Cir. 2017). Absolute immunity does not attach to claims for prospective relief, which Plaintiff seeks here. Nor are the individual Defendants entitled to qualified immunity, as the right to free speech in this context was clearly established. Plaintiff’s Title IX and WBPA claims remain, as they are based on his reports to UM-D of illegal actions and there is a direct, stated, causal connection between the reports and the retaliation. Causal connection and pretext are a question of fact for the jury. Defendants’ motion should be denied.

## II. FACTS

### A. Plaintiff, a former City of Detroit Police Detective of Sex Crimes, Joins the University of Michigan Dearborn Police Department

1. Plaintiff William "Elliott" Ashford is a 51-year-old father of three, whose entire career has been in military and police service. **A**, 5. After an honorable discharge from the United States Marine Corps, Plaintiff became a police officer for the city of Detroit, where he served for 22 years. **A**, 27, 40; ECF No. 1, PageID.3. He received the Detroit Police Department's Chief Merit Award four times, was named District Officer of the Year, and received the Medal of Valor. **B**. Plaintiff's expertise is in conducting complex criminal investigations, particularly of sexual assault crimes. As a detective of sex crimes, he investigated high profile sexual assaults with unknown perpetrators. **B**. **A**, Ashford Dep., 29, 36-37, 40-42.

2. After retiring in good standing, Plaintiff accepted a position as a police officer with the University of Michigan Dearborn Police Department ("UM-D DPSS") in April 2017. *Id*. at 42. His performance was rated either "Exemplary" or "Solid Performance". **C**. In August 2019, his supervisor remarked, "PO Ashford can always be counted on to display his professionalism and integrity in the performance of his duties." *Id*.

3. Defendant Jeffrey Evans was the UM-Dearborn Vice Chancellor for Business Affairs from June 2011 to July 2020. **D**, 8-9. Between June 2011 and fall 2018 he led the UM-D DPSS despite having no law enforcement training or experience. **D**, 7-8, 10-12. James Knittel was hired by the UM-D DPSS as a sergeant in February 2018. **E,** Knittel Dep., 7. "[W]ithin the first month," he was put in charge of criminal investigations, and within six months, Evans promoted him to the position of Captain. *Id.* at 79; **D,** 61-62. Evans later recommended Timothy Wiley be selected as Interim UM-D DPSS Chief; Knittel was selected as Deputy

Chief. **D,** 55-56; **E,** 8. Gorski, 93. In the fall of 2018, the University of Michigan ("UM") determined that UM-D DPSS should report to the UM DPSS Executive Director, Eddie Washington, rather than to Evans. **D**, 12.

### B. UM-D DPSS Gives Short Shrift to a Student's Complaint of Sexual Assault by a Professor

1. At the beginning of Plaintiff's March 1, 2019 shift, Interim Chief Wiley called him in to his office, and explained that a UM-D student had presented to a local hospital alleging she had been sexually assaulted by a professor in his on-campus office; he had demanded she perform oral sex on him in exchange for improving her grade in his class. **G**; **A**, 108.

2. According to the "Cooperative Policing Agreement Between the City of Dearborn and the University of Michigan-Dearborn", UM-D DPSS has primary investigative authority over all criminal matters that occurred on property owned or leased by UM or the nature of which involved UM-D students, faculty, or staff. **H**. Department policy states that supervisors "are responsible for the investigation of crimes on our shift." **I**. Criminal matters, including criminal sexual misconduct, that occurred on campus and/or which involved students, faculty, and/or staff were investigated and brought to a close by UM-D DPSS officers, including by referring cases to the prosecutor's office. **A**, 188, 191; **E,** 19-22. **J,** 21-22, 31-32; **F**, 36.

3. The UM-Ann Arbor Police Department ("UM-AA DPSS") responded to the hospital around midnight on March 1, 2019. **G**. According to a March 1, 2019 UM-D DPSS Incident Report authored by Officer Perry, "Capt. Knittel maintains the LIEN paperwork in the

investigation file and will conduct the follow-up investigation." **K,** at bates 801. Knittel assigned the case a UM-D DPSS case number and acronym: 19-047 DPPS. **E,** 79-80; **L**; **M**.

4. Plaintiff asked Wiley whether UM-D DPSS had taken the student's statement. **A**, 109. "We don't take statements from victims," Wiley scoffed, "they can come back to haunt us in court. You know that." *Id.* Wiley explained that Knittel and Thompson would soon take the professor's statement at his home. Plaintiff protested; the professor's statement should be taken in a controlled environment where it could be audio and video recorded, after gathering illuminating background information from the student's statement. *Id*. Wiley dismissed his concerns. "It doesn't matter," he told Plaintiff, "Wayne County Prosecutor's office had said it was no case." *Id*. Wiley and Knittel, in concert with Evans, directed the investigation over the course of the following days. **A**, 131. **D,** 51-53. Even though Evans no longer led the UM-D DPSS, Knittel and Wiley gave him a hard copy of the police report for case 19-047, for his "office files." **D,** 46-47.

5. UM-AA DPSS Detectives Pillsbury and Burke and Dearborn Police Department ("DPD") Detective Kass attended the student's follow-up interview, which was led by UM DPSS and held at the UM-D DPSS station. **K,** at bates 798, 793. According to Kass, Knittel determined he would speak with [the professor]. **K,** at bates 796. **E,** 24. Without assistance from DPD, UM DPSS officers interviewed the professor at his home, and took evidence from him that was logged into the UM-Ann Arbor DPSS evidence room **K,** at bates 802-804. UM-

D DPSS Officer Thompson, who had assisted in the professor's interview, told Plaintiff later that day that the professor admitted to engaging in sexual contact with the student, but claimed it was consensual. **A**, 111-12, 133, 137. It is uncontested that the professor was allowed to resign without discipline or findings of misconduct against him. Defendants never conducted any administrative investigation into the professor's actions, including by the Office of Institutional Equity, made any findings of misconduct or took any disciplinary action taken against him other than suspending him with pay. **N.**

6. Wiley and Knittel wrote a search warrant and affidavit for the professor's university accounts. **O.** Kass refused to act as the affiant. "Since **we [DPD] will not be prosecuting on this case**, for now, I would feel more comfortable if you were named as the affiant." **O,** at bates 574. Knittel secured the warrant and analyzed the results. **O**.

7. In a UM-D DPSS meeting held in mid-May 2019, Wiley and Knittel advised the department that case 19-047 was closed, and that they had composed and submitted a warrant package to the WCPO. **A**, 116-17, 120-21, 139-41. It is uncontested that this was false; no warrant package had been presented on case 19-047. **E**, 70, 72. Knittel ensured case 19-047 was recorded on the UM-D DPSS Daily Crime / Clery Log (the "Log") as "closed—referred to the WCPO". **A**, 189. **M, E,** 79-80. According to the UM Handbook for Campus Safety and Security Reporting, the Log is designed to provide the public crime information that is more specific information than the department's statistical disclosures on a more timely basis than those disclosures. **P**.The Log must be accessible to the public on-

site in either electronic or hard copy format for inspection, free of charge. Anyone—including media—may have access to the Log upon request during normal business hours. *Id.*; **L.**

### C. Plaintiff is Alarmed by UM-D DPSS's Mismanagement and False Reporting, and Complains to Chief Gary Gorski and Human Resources

1. In May 2019, Executive Director Washington selected Gary Gorski, who he had known for 30 years through their employment for the Michigan State Police ("MSP"), to permanently fill the UM-D DPSS Chief position over Knittel and Wiley[1], who were also finalists for the job. **J,** 47, 124-25.

2. By September 2019, Plaintiff had reason to believe that the case had not been referred to the WCPO. On September 4, 2019, Plaintiff called David Champine, Lead Attorney for the Wayne County Prosecutor's Office, who advised him that the WCPO had not received a warrant request package for case 19-047. **A**, 141-44. Plaintiff immediately relayed this information to Chief Gorski. *Id.* Gorski produced a "case update" document purporting to list all open and closed criminal matters and read aloud from it[2]" that case 19-047 was closed and had been submitted to the WCPO. *Id*. Knittel Dep., 28, 35, 36. Gorski, 93. Plaintiff explained that, per the WCPO, this was false. Ashford 92. He showed Gorski the Log, which

[1] Evans then selected Wiley for a new position of Associate Director in the DPSS. **D,** Evans Dep., 59-60. Wiley would eventually resign in lieu of termination for "lack of truthfulness and honesty" after an investigation showed he failed to complete documents, missed deadlines, and was untruthful. **D,** 21-22. **J,** 40.

[2] Since the September 4, 2019 meeting, the "case update" mysteriously disappeared. **E,** 36, 38. **F**, 96. Knittel either omitted case 19-047 altogether, or listed it as "closed". **F**, 95, 97, 99. **E,** 41.

reflected the same false information. **M**; **A**, 145-46. **F**, 52. Plaintiff explained that he believed the department was not reporting sexual assault cases properly. **A,** 92, 145. Gorski assured him he would look into the matter. *Id.* at 151.

3. The next day, September 5, 2019, Gorski asked Knittel for the status of case 19-047, and a copy of the case file. **E**, 40. **F**, 56. Gorski learned that Knittel had provided false information on the Log and "case update": no warrant request had been submitted. Knittel also gave Gorski an incomplete case file, containing only Officer Perry's initial report, the search warrant, and some supplemental reports. **F**, 112-14. Knittel lied to Gorski, telling him the case would be sent to the prosecutor once the DNA results were complete. **Q**. In reality, Kass told him she would submit the warrant request after reviewing his analysis of the search warrant results. **R**. Gorski inquired no further. **F**, 114.

4. Knittel would later offer illogical excuses to justify his false statements, including that DPD[3] bore ultimate responsibility for the investigation. "We were not…conducting any further investigation on the case; so as far as this campus, this department…it was closed, because…Dearborn was handling that." **E**, 42. "I was already working with the Wayne County prosecutors on the search warrant. That's why…it was there, and the plan all along was that it was going to be reviewed by the prosecutor's office, yes." **E**, 62. Gorski and Knittel admitted that there was no record that case 19-047 was "turned over to DPD", as would be required

[3] *See also* **Exhibit NN.**

by department policy. **F,** 127; **E**, 84; **S** at bates 313. Gorski admitted UM-D DPSS had primary investigative authority on the investigation. **F**, 158.

5. Moreover, Knittel's excuses contradict his own and Gorski's testimony that the Log's column for "disposition" means "status of the case", not whether a search warrant has been requested; "open" means "we're investigating"; "closed" means "it's not under investigation" and "that there's no more work being done, that there's nothing additional being done on it"; and "referred to the prosecutor's office" means referred for a determination on criminal charges. **E,** 66, 69, 71; **F,** 24-25, 40. According to Knittel, "…if the case is closed, in my opinion, there's no investigation being done on it..." **E**, 44-45.

6. As of September 4, 2019, the Log reflected false information about case 19-047. **E**, 70, 72. **F,** 52. Gorski is ultimately responsible for ensuring UM-D DPSS follows the law in maintaining its Clery records. **F**, 41. Although intentionally mischaracterizing the status of a case would be a serious rule violation, he never investigated how and why department records came to reflect false information. **F**, 48-49, 101-102. Nor did he investigate why Knittel misrepresented the case status, or why UM-D DPSS allowed the case to remain dormant for nearly a year. **F**, 142, 144-145. Knittel was never disciplined[4] for reporting false information about the case. **E**, 76-77. Gorski should have immediately corrected the Log upon learning that it contained false information. **D**, 75-76. Neither Evans nor Washington knew of any

[4] Nor has Knittel received a single written performance evaluation since being employed by UM-Dearborn DPSS. Knittel Dep., 90-91.

reason why Gorski would not have immediately corrected the Log on/about September 5, 2019. **D**, 76. **J,** 75. Gorski was never investigated or disciplined for dereliction of his duty to maintain accurate records. **F**, 41, 137.

7. On September 10, 2019, Plaintiff complained to UM-D Human Resources about UM-D DPSS's wrongdoing with regard to the student's report of sexual assault and quid pro quo sexual harassment. **T**. The Senior Human Resources Consultant did nothing but offer to speak with her supervisor; when Plaintiff later advised her the matter remained unresolved, she said that if she did not hear from him again she would consider it closed. **A**, 154.162-63, **U.** Human Resources intended to ignore the matter. **A**, 63-64. According to Plaintiff:

> "This is appalling...You make false, written, oral statements about a crime that has allegedly took place of this magnitude and you don't get involved in it, there's a problem…By showing up to HR and telling them of…this incident…yes I'm asking you to do something…Her job." **A**, 164-65.

8. On or about September 11, 2019, Gorski advised Plaintiff of Knittel's latest excuse: case 19-047 was "on hold" pending analysis of DNA evidence. **Q; A**, 152. Plaintiff explained this was clearly a pretext. Since the professor confessed to the sexual activity, and UM-D DPSS had secured the relevant physical evidence, it should not wait for the DNA analysis before submitting the case to the WCPO[5]. **A**, 152-53. **F**, 132-133. Gorski did nothing. According to MSP Lieutenant Mike Shaw, the final DNA analysis was completed on

[5] Plaintiff was right. DPD had told Knittel that it would submit the warrant request after reviewing the search warrant results. **R.**

September 12, 2019. **V**. **E**, 48. Knittel testified that he updated Gorski on this development, but the investigation continued to languish. **E**, 50-51.

### D. Plaintiff Complains to the UM-D Board of Regents, and A Tip from an Anonymous UM-D DPSS Officer Leads a Journalist to Investigate Case 19-047

**F.** Gorski and HR were dead ends. On September 16, 2019, Plaintiff sent an anonymous letter to the UM-D Board of Regents detailing his complaints. **W**. He explained that he had reported this wrongdoing to both Gorski and HR, to no avail:

> "I ask that this governing body investigate and institute checks and balances of the crime statistics. There is no common-sense explanation for two career law enforcement officials to make such an egregious error with investigation and the failure to report it to the prosecuting authority, unless you were never going to report it at all… It is imperative we consider the message we send to the victim when we fail to properly report and investigate, because that failure sends a clear message…that we don't care."

Evans and Gorski refused to agree that it was appropriate for Plaintiff to report UM-D DPSS's wrongdoing to the Board of Regents. **D**, 76-77. **F**, 187. Plaintiff received no response. **A**, 171-72.

2. But Plaintiff was not the only UM-D DPSS officer with grave concerns about case 19-047. In or around mid-September 2019, another UM-D DPSS officer reached out to Detroit News reporter George Hunter. **A**, 174. The officer provided Hunter with Plaintiff's contact information and information about case 19-047. **A**174. On October 11, 2019, Hunter sent a Freedom of Information Act ("FOIA") Request to UM-D seeking information about the professor named in case 19-047. **X.**

Case 2:20-cv-10561-TGB-EAS ECF No. 96-2, PageID.1601 Filed 09/12/24 Page 19 of 40

3. Defendants knew that the false Daily Crime / Clery Log was responsive. They feared public scrutiny of the case, which they had bungled, particularly in light of Plaintiff's efforts to redress these issues. **A**, 186-87. **F**, 133-34. Gorski immediately ordered Knittel to change the Log to reflect case 19-047 was "open", which he did. **F**, 52,53,134. **E**, 52-53, 59. 80. UM produced the doctored Log in response to the request. **Y**. **F**, 134. Gorski, anxious about potential media coverage, told Washington he had ordered the Log be changed in response to the FOIA request, despite knowing for several weeks it was false. **F**, 53, 137-38. **J,** 80, 82. 61, 64.

4. Spooked by the FOIA request, Knittel and DPD Lieutenant Andreas Barnett quickly connected about case 19-047. **E** Dep., 59. Barnett emailed Knittel on October 23, 2019 seeking information from him "as soon as possible". **Z**. Knittel rushed over to the DPD station to confer with Barnett. *Id.;* **E**, 61. According to the WCPO, the warrant request was submitted on October 25, 2019—two days later. **V**.

**E. Plaintiff Complains to the WCPO and Agrees to Speak with The Detroit News**

**F.** On October 24, 2019, Plaintiff emailed a detailed account of UM-D DPSS's mismanagement and false reporting of case 19-047, and his attempts at redress, to the WCPO. **AA.** According to Plaintiff:

"The intended purpose of this email is to offer information regarding a CSC (criminal sexual conduct) case 19-047 that has not been investigated and reported to your office as documented…the entire handling of this investigation along with its fraudulent reporting to [Chief Gorski] and the false log sheet entries suggest that this case was never going to be submitted to the prosecuting authority. The most condemning factor

in this matter is the lapse of time from March 1st to the present, with still no warrant having been submitted." **AA**.

2. Hunter contacted Plaintiff in late October 2019 and asked whether he would discuss the case. Plaintiff acquiesced, on the condition of anonymity. **A**, 174, 193. **V**. Plaintiff provided Hunter the date the case was first reported to UM DPSS, a copy of the Log showing it was "closed", and his communications to the Board of Regents and WCPO. All the information Plaintiff provided Hunter was publicly available via the Log, the police report, or other university records. **A**, 100, 176, 183. As a former detective, Plaintiff was careful not to provide any information that could have negatively affected the case. **A**, 100, 177. Plaintiff spoke to the Detroit News as a last resort. **A**, 176, 178, 227.

3. On October 28, 2019, Kenneth Kettenbell, UM Vice Chancellor of External Relations emailed Gorski and Evans. Hunter had contacted Kettenbell about case 19-047. Kettenbell's email, entitled "URGENT—READ THIS" (emphasis in original) asked him to explain several discrepancies, including why the case was "closed out" if it was "still open"; and why UM was claiming the case was "turned over" to DPD[6] when it led the investigatory actions. **BB**. Evans, Gorski, and Kettenbell collaborated on a response. **D**, 82-84.

### F. Defendants Learn of Plaintiff's Protected Activity and Immediately Retaliate Against Him

[6] Kettenbell told Hunter case 19--47 was "turned over to Dearborn police" because that "we don't have detectives." This was a lie. Both Pillsbury and Burke, who had worked on the case, were UM DPSS detectives. Kettenbell also lied to Hunter when he stated that the case was logged as "closed" "when [UM-D DPSS's] investigation concluded"; Gorski admitted the investigation remained active within the UM-D DPSS through February 2020. **F**, 146-47.

1. Hunter's article, published on November 3, 2019, reflected the information Plaintiff shared with him, as well as information from other sources, including the anonymous UM-D DPSS officer, DPD, MSP, and Kettenbell. **A**, 192. **V**. It also recounted Plaintiff's attempts at redress through the Board of Regents and WCPO. **V**. Gorski immediately suspected Plaintiff was the "whistleblower". **F**, 150. Washington and Evans "w[ere] not happy with the article." **D**, 89. **F,** 141-42. The same day it was published, Gorski and Washington came up with a plan for Gorski to confront Plaintiff, and attempt to extract information from him. **J,** 84, 85. **CC**. **F**, 141-142. Defendants could not countenance Plaintiff exposing UM-D DPSS's wrongdoing to the authorities and the public.

2. On November 4, 2019, Gorski met with Plaintiff about the article. **A**, 198. "[W]e need to circle our wagons around the university," Gorski explained. "The university cannot be made to look like it has an unsafe campus environment, and we need to get ahead of that." **A**, 197. Plaintiff told Gorski that he was the "whistleblower". Gorski asked him to answer questions in writing, which Plaintiff ultimately declined to do. **A**, 200-02. **DD**. On November 5, 2019, Gorski reported back to Washington that Plaintiff was the whistleblower. **EE**.

3. Defendants immediately began the disciplinary process. On November 6, 2019, Gorski met with Teresa Oesterle. As the UM-DPSS Deputy Director for Administrative Services, Oesterle oversees human resources functions for UM-DPSS, including the "professional standards investigation" ("PSI") process. **FF**, 7, 9, 11, 13. **F**, 195. They

determined that Plaintiff would be subject to a PSI. **GG**. **FF**, 41, 49. **F**, 166. Gorski filed an internal complaint against Plaintiff, triggering the PSI. **HH**. **F**, 19-20.

4. On November 25, 2019, Gorski notified Plaintiff that he would be investigated for "divulge[ing] information from an open UM-Dearborn Department of Police and Public Safety[7] criminal sexual conduct investigation" in violation of the UM-D DPSS Policy for the Standards of Conduct[8], Section III—Procedures, subsection B—Public Statements, Appearances, and Endorsements. **II**. The Notice does not state what "information" was at issue. *Id.*

5. UM-Ann Arbor DPSS Chief Robert Neumann conducted the PSI and found that Plaintiff was guilty of violating the Standards of Conduct and determined that he was "insubordinate" during his PSI interview. Neumann's "Preliminary & Advisory Professional Standards Investigation Report Narrative Summary" (**JJ)** is riddled with factual errors and internal inconsistencies, strongly suggesting a preordained outcome. **OO**. Its conclusions

[7] Notably, for the purposes of disciplining Plaintiff, Defendants characterized the investigation as being led by UM-Dearborn DPSS—not Dearborn Police Department. **II**. **F**, 172. However, when asked to justify the UM-Dearborn DPSS's mismanagement and false reporting of the case, Defendants assert the opposite. Gorski admitted at his deposition that UM-D DPSS exercised primary authority over the investigation of case 19-047. **F**, 158. This is borne out by the record of the case. **Ex. NN.**

[8] While employed by UM-D DPSS, Plaintiff was never provided a copy of the University's Standard Practice Guide, or its discrimination, harassment, or sexual harassment policies. Neither Plaintiff nor the other UM-D DPSS officers received any non-discrimination, non-harassment, or non-retaliation training. **A,** 71, 73-4. Plaintiff was not provided a copy or made aware of the department's policy concerning public statements or its standards of conduct until they were used to discipline him. *Id*. at 74-75. Indeed, upon assuming his job with the University, Plaintiff was not even directed to where these documents could be found. *Id*. at 78.

differ from those later presented by Gorski as his rationale for suspending[9] Plaintiff, which further demonstrates that it was a pretext for unlawful retaliation.

6. Gorski received the Report on or around January 14, 2020, and concluded that his complaint was substantiated. Gorski, 20-21. He met with Oesterle and Ede to discuss what discipline should be imposed. Oesterle Dep., 53-55. Gorski, 19-21, 184-85, 193. Gorski testified that Oesterle and Ede recommended Plaintiff's termination. Gorski, 194 197. Oesterle Dep., 54-55; 58-60. Oesterle denied that she or Ede made this recommendation, or any other. Oesterle Dep., 59-60, 61. Evans also would have supported Plaintiff's termination. Evans Dep., 92-93. Oesterle, Ede, and Gorski did not discuss any mitigating circumstances, such as Plaintiff's work record. Oesterle Dep., 62. On January 17, 2020, Gorski emailed Washington the PSI Report and a Disposition Letter suspending Plaintiff for 10 days. UMASHFORD 942.

---

[9] Neumann concludes, without citing any evidence, that Plaintiff disrupted the investigation because "UM-Dearborn DPSS, the UM-Dearborn administration, the Dearborn Police Department, and the Wayne County Prosecutor's office" had to "divert resources to manage" FOIA requests allegedly triggered by Plaintiff's whistleblowing. **JJ** at bates 889-890. Hunter's FOIA requests came in early October, before Plaintiff spoke with him. Moreover, the University, DPD, and are required by law to respond to FOIA requests. The Report does not substantiate how responding to a routine FOIA request "divert[ed] resources" from the investigation, which laid dormant until after the FOIA requests. Gorski, Evans, Washington, and Oesterle testified that they knew of no evidence Plaintiff disrupted the investigation. **FF**, 64, 66-67. **J,** 102, 109-10. **D**, 104. **F**, 201, 209-10.

7. On or around January 21, 2020, Gorski called Plaintiff into his office. **A**, 214. Gorski told Plaintiff that he found his statements in the PSI to be accurate. "You did nothing wrong but tell the truth with passion," Gorski told him. *Id*.

8. Gorski discussed Plaintiff's discipline with Evans on or about January 28, 2020. **D**, 98-99. Evans disclaimed any involvement in UM-D DPSS disciplinary actions before or after the realignment, but conceded he provided input in Plaintiff's case. **D**, 13, 18-19. Evans approved of Gorski's decision, and ensured he had followed University protocol on consulting stakeholders in the disciplinary process, including Oesterle and Washington. **D**, 20, 98-100.

**G. Defendants Retaliate Against Plaintiff By Suspending Him for 10 Days**

1. On January 29, 2020, Gorski met with Plaintiff, and suspended him for 10 days without pay. Gorski ensured Plaintiff knew there was "a lot of discussion" about terminating his employment. **A**, 211, 215. **KK. LL.** Plaintiff emphatically denied violating any department rule or policy. **A**, 79, 228.

2. The "Final Disposition of Professional Standards Investigation" states that Plaintiff violated the UM-Dearborn DPSS Policy for Standards of Conduct, Section III, B, 1, a and b because:

a. **Plaintiff "made claims to the Detroit News that UM-DPSS was involved in a cover-up;"**

The article does not quote Plaintiff as stating that UM DPSS was involved in a cover-up. Gorski did not know if Plaintiff used the term "cover-up" with the Detroit News, nor "specifically what he said to the media." **F**, 199, 200. Washington admitted that the

surreptitious alterations to the Log looked like a cover-up. **J,** 87. Moreover, Defendants never investigated whether a cover-up took place. **F**, 48, 101-102, 142, 144-145. **J,** 65. Gorski admitted that he "did not know" whether an officer would violate the Standards of Conduct for saying UM DPSS engaged in a "cover-up" if one had occurred, and agreed officers were free to say there was fraud, if true. **F**, 180-81. Washington understood why Plaintiff spoke to Hunter about case 19-047, and admitted that if he had not done so, it might not have been presented to the prosecutor. **J,** 75-76, 81.

**b. Plaintiff was quoted in the Detroit News article as saying, "From the start the investigation showed signs of trouble," and (3) "the article" claimed that UM-Dearborn DPSS wanted to keep the investigation internal and only enlist the help of DPD to collect DNA evidence.**

While Gorski suspended Plaintiff, in part, for his statement of opinion to the WCPO that the investigation showed signs of trouble, Kettenbell's comparable statement that "it's an awful incident" would not be a disciplinable offense. **F**, 213-14. Gorski admitted that he did not know "specifically what [Plaintiff] said to the media." **F**, 199, 200. Gorski admitted that he did not know who provided the information about "keep[ing] the investigation internal" to the Detroit News. **F**, 213.

**c. Plaintiff obtained information by reason of his position which he divulged to the Detroit News; and shared key and sensitive case details including the name of the professor, which "resulted in media coverage" that could compromise the fairness of the adjudication and that was "disruptive to the orderly and efficient operation" of UM-D DPSS and the other agencies involved.**

Gorski and Washington testified that the professor's name was public record. **F**, 173-74. **J** 98-99. According to Gorski, the Standards of Conduct do not distinguish between work-related information that officers are permitted or forbidden to share. **F**, 174. Thompson was not disciplined for sharing information about the case with Plaintiff, nor were Knittel and Wiley disciplined for providing the police report to Evans, when he was no longer in charge of the department. Gorski conceded that UM-D DPSS represented the case was "closed" when Plaintiff shared information about it outside the department. **F**, 175.

3. According to Gorski, Plaintiff could not have violated the Standards of Conduct unless his action negatively impacted the investigation. **F,** 208-09. Evans, Oesterle and Washington supported the suspension, despite not knowing what information Plaintiff shared outside the department. Under oath, Gorski, Evans, Washington, and Oesterle admitted they knew of no evidence Plaintiff caused any disruption to the investigation. **FF**, 64, 66-67. **J,** 102, 109-10. **D**, 104. **F**, 201, 209-10. They further admitted they knew of no evidence that Plaintiff intended his statements to have an adverse effect on UM-D DPSS morale, discipline, and operations; nor did they know of any evidence that morale, discipline, and operations, or the investigation were adversely impacted by Plaintiff's actions. **F**, 200, 209-10. **FF**, 53-54, 55-56, 64. 57. 67. **J,** 96, 102, 109-10, 107-08. **D**, 97, 102-03. 104.

4. Last, Gorski found that Plaintiff was "insubordinate" when he refused to identify the officer who initially shared information with Hunter. According to the "Final Disposition", Section 7 (A) (1) does not state that employees are required to answer "all" questions, and

only requires employees to make "relevant statements…to PSI investigators when directed." 880. Gorski later admitted to Plaintiff that the other officer's name was likely irrelevant. **MM**.

5. Plaintiff served the suspension. **A**, 216. According to Plaintiff, "Y]ou can't have it both ways. You can't ask a police officer to be only good when he's on duty and then when he's off duty don't – you know, turn a blind eye. It doesn't work. It never will work." **A**. "They made excuses when I brought it to their attention, and they disciplined me over revealing the truth about their neglect of not having done what they were supposed to and what they reported they had done." **A** 127-28. Defendants never investigated whether Plaintiff's discipline was unlawful retaliation. **J**, 16.

## III. LEGAL ARGUMENT

### A. Plaintiff's First Amendment Retaliation Claim Should Proceed to Trial

#### 1. Absolute immunity does not bar Plaintiff's claims for prospective injunctive relief against Defendants.

The Eleventh Amendment does not immunize state officials acting in their official capacities against an action for prospective relief compelling their compliance with federal law or enjoining them against future violations. *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ex parte Young*, 209 U.S. 123, 127 (1908). As relief for Defendants' ongoing First Amendment violation against him, Plaintiff seeks "Declaratory and Equitable Relief" in the form of "an injunction prohibiting any further acts of discrimination, intimidation, or retaliation" against him, "interest, costs, and reasonable attorney fees," and "other equitable relief," such as vacation and